Plantation Patterns, Incorporated v. Commissioner. John S. Jemison, Jr. and Marie S. Jemison v. Commissioner.
Plantation Patterns, Inc. v. Commissioner
Docket Nos. 3962-68, 3967-68.
United States Tax Court
T.C. Memo 1970-182; 1970 Tax Ct. Memo LEXIS 171; 29 T.C.M. (CCH) 817; T.C.M. (RIA) 70182; June 30, 1970, Filed William Bew White, Jr. and Griffith F. Pitcher, 1500 Brown-Marx Bldg., Birmingham, Ala., for the petitioners. Robert W. Goodman, for the respondent. QUEALY
Memorandum Findings of Fact and Opinion QUEALY, Judge: The respondent determined deficiencies in the income tax of Plantation Patterns, Inc. (docket No. 3962-68) and Mr. and Mrs. John S. Jemison, Jr. (docket No. 3967-68) as follows: Docket Number
Taxable Year Ended
Deficiency
3962-68
September 30, 1963
[1] $ 39,175.97
3962-68
September 30, 1964
56,643.70
3962-68
September 30, 1965
28,224.98
3967-68
December 31, 1963
103,436.20
*172 Certain adjustments set forth in the notices of deficiency were not contested by the respective petitioners, and certain concessions have been made by the parties. The issues presented for decision are: (1) Whether fifty-five 5 i/2 percent serial notes aggregating $609,878.33 issued on September 28, 1962 by Plantation Patterns, Inc. and guaranteed by Mr. John S. Jemison, Jr. represented an indirect contribution by Mr. Jemison to the capital of Plantation Patterns, Inc. (2) Whether Plantation Patterns, Inc. properly valued inventory and good will on the liquidation of a subsidiary pursuant to section 334(b)(2). [2]
Findings of Fact The parties submitted stipulation of facts, supplemented by oral testimony. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. 818 Plantation Patterns, Inc. (hereinafter referred to as "New Plantation" to distinguish it from an earlier corporation with the same name), petitioner in docket No. 3962-68, is a corporation organized under the laws of the State of Alabama. New Plantation filed its income tax returns, *173 on the accrual basis, for its taxable years ended September 30, 1963 through September 30, 1965 with the office of the district director of internal revenue, Birmingham, Alabama. Its principal place of business at the time its petition was filed in the instant case was 4601 Georgia Road, Birmingham, Alabama. John S. Jemison, Jr. and Marie S. Jemison, petitioners in docket No. 3967-68, are husband and wife. They filed their joint income tax return for their taxable year ended December 31, 1963 with the office of the district director of internal revenue, Birmingham, Alabama. They resided at 2401 Henrietta Road, Birmingham, Alabama, at the time their petition was filed in this case. New Plantation's corporate predecessor, which was also called Plantation Patterns, Inc. (hereinafter referred to as "Old Plantation" to distinguish it from the corporate petitioner in the instant case) was engaged in the business of manufacturing wrought iron furniture in Birmingham, Alabama, and of manufacturing metal office chairs at its United Chair Division in Leeds, Alabama, from the time of its incorporation in 1956 until September 28, 1962. During its five taxable years for 1957 through 1961, *174 the net income (or loss) of Old Plantation after all taxes and excluding income or loss of the United Chair Division was as follows: Year
Net Income (Loss)
1957
($ 1,096.83)
1958
7,533.75
1959
8,067.66
1960
19,737.69
1961 94,637.46
Total
$128,879.73
Prior to September 28, 1962 the stockholders of Old Plantation and the number of shares owned therein were as follows: Thomas E. Jernigan
162,493 shares
William C. Jernigan
80,718 shares
John M. Goodwin
8,812 shares
H. Ferrell Jernigan
353 shares
James C. Stone 17,624 shares
Total
270,000 shares
Prior to September 28, 1962 Mr. Thomas E. Jernigan was president and Mr. William C. Jernigan was vice president and secretary of Old Plantation. During the spring of 1962 Old Plantation made plans for a public offering of 100,000 shares of its common stock; however, this public offering was not consummated. The purpose of the proposed public offering of Old Plantation's stock was to raise funds to develop the United Chair Division and to permit Old Plantation to operate both the wrought iron furniture business and the United Chair Division's metal office chair business. When the *175 proposed public offering was not consummated, Messrs. Thomas E. and William C. Jernigan decided that Old Plantation did not have sufficient capital to continue both the wrought iron and metal office chair businesses. Messrs. Thomas E. and William C. Jernigan decided that it would be in their best interests to sell the wrought iron furniture business and to develop the United Chair Division's metal office chair business. Sometime during the summer of 1962, the shareholders of Old Plantation, acting as a group, decided that they would attempt to sell their interests in both the wrought iron furniture and metal office chair businesses by way of a sale of their Old Plantation stock. In July of 1962 Mr. Jack Parish, a member of the accounting firm that had worked on the prospectus for the proposed public offering of Old Plantation stock, contacted Mr. John S. Jemison, Jr., the president and controlling shareholder of Jemison Investment Co., Inc. and inquired if he would be interested in purchasing, or finding a purchaser for, the stock of Old Plantation. At the time he was contacted in July 1962, Mr. John S. Jemison, Jr. was experienced in the business of investment banking, having *176 been in that business for at least twenty years. As an investment banker, he had arranged for the acquisitions of businesses, both for clients of Jemison Investment Co., Inc. and for its own account. He had handled such business acquisitions both as purchases of assets and as purchases of stock. In the course of his business career, Mr. Jemison had become a member of the board of directors of a number of corporations. Mr. Jemison carried on his business activities largely, if not entirely, through Jemison Investment Co., Inc. 819 Jemison Investment Co., Inc. had been engaged in the business of acting as agent or broker for purchasers and sellers of businesses since its organization by Mr. Jemison in 1949. During 1962 Jemison Investment Co., Inc. had assets of eleven million dollars, including a number of wholly owned subsidiaries, such as a transit company that operated the city bus system in Birmingham, Alabama, a company that manufactured window frames in Chicago, Illinois and operated a textile mill in North Carolina and corporations that operated department stores in St. Petersburg, Florida and Tuscaloosa, Alabama. Mr. Parish arranged for negotiations between Messrs. *177 Jemison and Thomas E. Jernigan concerning the sale of Old Plantation, which took place during July and August 1962. These negotiations led to a general understanding between Messrs. Jemison and Thomas E. Jernigan that Mr. Jemison would form a corporation to purchase all the stock of Old Plantation held by Messrs. Thomas E. Jernigan, William C. Jernigan, John M. Goodwin, H. Ferrell Jernigan, and James C. Stone; and that Old Plantation would sell its United Chair Division's metal office chair business to Messrs. Thomas E. and William C. Jernigan. In a letter addressed to Mr. Thomas E. Jernigan dated August 24, 1962, Jemison Investment Co., Inc. set forth a conditional offer to purchase the "assets of the Plantation Patterns Division." This letter stated: We would organize a new corporation to be known as Plantation Patterns Corporation (it is understood that you would agree to change the name of the existing corporation) and we would pay in a total of $155,000 in cash - $150,000 in 6 1/2% subordinated notes - which notes would be subordinated to your notes - and $5,000 in common stock. On September 25, 1962 Mr. Jemison caused New Plantation to be organized under the laws of the *178 State of Alabama. Upon its incorporation, New Plantation issued ten shares of common stock with a par value of $100 per share to its incorporators. On the same date that it was incorporated, the incorporators transferred those ten shares of stock to Mrs. Marie S. Jemison. On September 26, 1962 New Plantation issued an additional 40 shares of common stock to Mrs. Jemison for a price of $4,000 cash. Mrs. Jemison paid for this additional 40 shares and her initial ten shares of stock by her check for $5,000 dated September 26, 1962. The record does not indicate whether or not the funds for the purchase of the stock came from the separate estate of Mrs. Jemison. The total capital stock of New Plantation, consisting of the 50 shares of common stock held by Mrs. Jemison, remained at $5,000 through September 30, 1966. Mrs. Jemison did not take an active part in the preliminary negotiations leading up to the incorporation of New Plantation on September 25, 1962 in any of the events that took place thereafter or in the management of New Plantation from the time it was incorporated to September 30, 1966, inclusive. Mrs. Jemison along with her husband and a Mr. Thomas Bradford were the directors *179 of New Plantation. There was a meeting of the directors at 9:15 a.m. and a joint meeting of the directors and stockholders of New Plantation at 12:00 noon on September 28, 1962. Although Mrs. Jemison was the sole shareholder of record and a director, she did not attend either meeting. Mrs. Jemison held the stock of New Plantation only by arrangement of Mr. Jemison. Mr. Jemison was active in the management of New Plantation. Mr. Jemison testified that he had contacts with large department stores that sold wrought iron furniture. On September 27, 1962 New Plantation obtained $150,000 from Bradford and Co., Inc. unrelated finance or investment company, for which it issued 6 1/2 percent serial debentures aggregating $150,000 maturing in $50,000 units on September 1, 1974, 1975 and 1976. The debentures were subordinated to all other indebtedness of New Plantation and were not guaranteed as to payment of either principal or interest. Mr. Thomas Bradford controlled Bradford and Co., Inc. As there was no place in the business of Bradford and Co., Inc. for Mr. Bradford's youngest son, Mr. Bradford was looking for an opportunity for that son with another company. The loan by Bradford and *180 Co., Inc. was an inducement to Mr. Jemison to place Mr. Bradford's son with New Plantation. Although this advance was made with little security and no priority as to repayment, it was none the less a bona fide loan. After the sellers had made an independent investigation of Mr. Jemison's credit, 820 they accepted with modifications the proposal made by Jemison Investment Co., Inc. in its letter of August 24, 1962 and the terms of sale were embodied in an agreement dated September 28, 1962 between New Plantation and the stockholders of Old Plantation. Pursuant to that agreement, the stockholders agreed to sell and New Plantation agreed to buy, the stock of Old Plantation for a stated consideration equal to the net worth of Old Plantation plus $644,909.53. The total purchase price was to be paid as follows: (1) A cash payment of $100,000 at the time of closing; (2) An amount equal to the book value of the United Chair Division ($183,435.84) without interest, in installments on January 10, 1963, March 15, 1963 and June 15, 1963; [3] and (3) The balance ($609,878.33) in equal installments of $50,000 beginning October 1, 1963 and each year thereafter, with a final installment *181 for the remainder due on October 1, 1973. The notes representing such installments were to be guaranteed by Jemison Investment Co., Inc. and by Mr. Jemison, personally. In accordance with the terms of the agreement of September 28, 1962, the stockholders of Old Plantation further agreed not to compete, directly or indirectly, with New Plantation in its wrought iron furniture business for a period of ten years ending October 1, 1972. No part of the purchase price was allocated to these agreements. Pursuant to the agreement of September 28, 1962 Mr. Thomas E. Jernigan agreed to serve as president and chief executive officer of New Plantation for two years beginning October 1, 1962. He testified that he was of the belief that New Plantation would be able to generate sufficient funds to satisfy New Plantation's obligation to the selling shareholders. Pursuant to the agreement dated September 28, 1962, the stockholders of Old Plantation sold their stock to New Plantation for a stated consideration of $893,314.17, of which *182 $100,000 was paid in cash at the time of the sale, and the balance of $793,314.17 was payable in installments, as follows: Date
Amount
Interest
1/10/63
$ 83,435.84
None
3/15/63
50,000.00
None
6/15/63
50,000.00
None
10/ 1/63
50,000.00
5 1/2%
10/ 1/64
50,000.00
5 1/2%
10/ 1/65
50,000.00
5 1/2%
10/ 1/66
50,000.00
5 1/2%
10/ 1/67
50,000.00
5 1/2%
10/ 1/68
50,000.00
5 1/2%
10/ 1/69
50,000.00
5 1/2%
10/ 1/70
50,000.00
5 1/2%
10/ 1/71
50,000.00
5 1/2%
10/ 1/72
50,000.00
5 1/2%
10/ 1/73
109,878.33
5 1/2%
New Plantation issued 15 non-interest bearing notes aggregating $183,435.84 to evidence the payments due January 10, 1963, March 15, 1963 and June 15, 1963. These notes were not guaranteed, and the indebtedness was subordinated to all other indebtedness of New Plantation except the $150,000 owed to Bradford and Co., Inc. The parties who negotiated the agreement intended that payment of these notes would be effected through the sale by Old Plantation of its United Chair Division's metal office chair business to Messrs. Thomas E. and William C. Jernigan. New Plantation also issued fifty-five 5 1/2 percent serial notes aggregating *183 $609,878.33 to evidence the remaining payments due on account of the purchase of the stock. These notes were guaranteed absolutely as to principal and interest by Mr. Jemison individually and by Jemison Investment Co., Inc.Jemison Investment Co., Inc. received a guarantee fee of $15,000 per year for its guarantee. Mr. Jemison did not receive any fee for his guarantee. The guarantees were required due to the small down payment made on the purchase and the requirement that the debt had to be unsecured so that New Plantation could obtain financing for its operations. The notes for $50,000 due October 1, 1963 and $50,000 due October 1, 1964 were not subordinated so that Mr. Jemison could arrange for the sellers to discount these notes with a bank. This enabled Messrs. Thomas E. and William C. Jernigan to obtain additional capital to develop the office chair business. The remaining notes were subordinated to all other indebtedness except the 6 1/2 percent serial debentures issued to Bradford and Co., Inc. Pursuant to another agreement dated September 28, 1962, Old Plantation agreed 821 to sell the assets of its United Chair Division to Messrs. Thomas E. and William C. Jernigan, *184 effective as of the close of business on August 31, 1962. In consideration for that sale, Messrs. Thomas E. and William C. Jernigan agreed to pay to Old Plantation the sum of $183,435.84. In its final return Old Plantation reported that its basis in the assets of the United Chair Division equalled the proceeds received on that sale. As of September 28, 1962, Old Plantation was liquidated and its assets were transferred to, and its liabilities were assumed by, New Plantation. Following the liquidation of Old Plantation, the business and assets of the United Chair Division were immediately transferred to Messrs. Thomas E. and William C. Jernigan, who issued to New Plantation a non-interest bearing promissory note dated September 28, 1962 in the principal amount of $183,435.84 payable as follows: Due Date
Amount
October 8, 1962
$ 83,435.84
March 15, 1963
50,000.00
June 15, 1963 50,000.00
Total
$183,435.84
Messrs. Thomas E. and William C. Jernigan duly made the payments on this note on or before the due date, while New Plantation similarly paid the non-interest bearing notes aggregating $183,435.84 due January 10, 1963, March 14, 1963 and June 14, 1963. As *185 a result, the United Chair Division was acquired by Messrs. Thomas E. and William C. Jernigan through an exchange or offset of notes. On October 24, 1963 New Plantation paid Mr. H. Ferrell Jernigan $730.92 in full satisfaction of both the principal and interest due on the serial notes held by him on that date. During the period from October 1, 1962 to September 30, 1966, New Plantation otherwise duly paid principal and interest as due on the 6 1/2 percent debentures issued to Bradford and Co., Inc. and on the 5 1/2 percent notes issued to the stockholders of Old Plantation. Said payments were made by New Plantation without recourse to any additional financing. During its taxable years ended September 30, 1963 through September 30, 1966 New Plantation accrued interest expense on the 5 1/2 percent serial notes issued to the shareholders of Old Plantation and the 6 1/2 percent debentures issued to Bradford and Co., Inc., which it deducted on its tax returns filed for those years as follows: Year EndedSeptember 30
6 1/2%Deben- tures
5 1/2% Notes
Total
1963
$9,750.00
$33,543.31
$43,293.31
1964
9,750.00
30,842.86
40,592.86
1965
9,750.00
28,006.19
37,756.19 [4]
1966
9,750.00
25,260.29
35,010.29
*186 In the notice of deficiency addressed to New Plantation for its taxable years ended September 30, 1963 through September 30, 1966, inclusive, the respondent disallowed as an expense the deductions claimed by New Plantation on account of such interest. In its return for the period September 25 to September 30, 1962, New Plantation reported assets received and liabilities assumed on the liquidation of Old Plantation as follows: 822 *10 EXHIBIT B
Cost To
Fair
Liquidating
Market
Corporation
Value
ASSETS RECEIVED
Petty cash
$ 50.00
$ 50.00 A
Travel advances
500.00
500.00 A
Accounts receivable - trade
$36,570.71
36,570.71
Less reserve for bad debts 3,000.00
3,000.00
$ 33,570.71
$ 33,570.71 A
Account receivable - United Chair
57,279.63
57,279.63 A
- T. E. & W. C. Jernigan - net
165,700.71
165,700.71 A
- Advances to employees
1,705.66
1,705.66 A
Inventory
184,936.04
184,936.04
Prepaid insurance
9,380.52
9,380.52
Prepaid interest
1,246.95
1,246.95
Prepaid advertising
14,274.33
14,274.33
Machinery and equipment - net
50,221.55
391,028.50
Office equipment - net
**
18,733.00
Automotive equipment - net
333.57
525.00
Leasehold improvements
27,623.20
37,374.50
Leasehold
0
42,463.31
Non-compete agreements 0
242,500.78
$546,822.87
$1,201,269.64
LIABILITIES ASSUMED
Bank overdrafts
$ 1,011.74
Notes payable
40,207.10
Accounts payable - trade
55,279.89
Due to factor
83,362.83
Accrued salaries, wages and commissions
8,329.80
Accrued bonus and vacation pay
12,822.44
Accrued payroll taxes and taxes withheld from employees
12,840.46
Accrued taxes, other than income taxes
3,079.39
State taxes on income - prior years
918.61
Federal and state taxes on income - current year
91,464.50
Account payable to former stockholders 5,377.19
$314,693.95
*187 In determining the basis to be allocated to the assets received, New Plantation included in said return, the following computation: EXHIBIT B-1
The computation of the adjusted basis of the stock of Plantation Patterns, Inc., at September 28, 1962; and the allocation of the adjusted basis to the assets received in liquidation are shown below. The computations are made in accordance with Regulation 1.334-1(c):
Adjusted basis of stock:
Cost of 270,000 shares of stock, acquired September 28, 1962
$ 886,575.69
Adjustments required by Regulation 1.334-1(c): Add unsecured liabilities - see Exhibit B 314,693.95
ADJUSTED BASIS OF STOCK
$1,201,269.64
Deduct cash and its equivalent received from the distribution - See Exhibit B 258,806.71
BASIS TO BE ALLOCATED TO NON-CASH ITEMS $ 942,462.93
Allocation of basis to non-cash items: Fair Market Value
Basis Allocated
Inventory
$184,936.04
$184,936.04
Prepaid insurance
9,380.52
9,380.52
Prepaid interest
1,246.95
1,246.95
Prepaid advertising
14,274.33
14,274.33
Machinery and equipment
391,028.50
391,028.50
Office equipment
18,733.00
18,733.00
Automotive equipment
525.00
525.00
Leasehold improvements
37,374.50
37,374.50
Leasehold
42,463.31
42,463.31
Non-compete agreements 242,500.78
242,500.78
TOTALS $942,462.93
$942,462.93
*188 823 The sum of $184,396.04 shown as the fair market value of the inventory in the schedules included by New Plantation in its return represented the book value of the inventory of Old Plantation computed as the lower of average cost or market. The fair market value of the inventory received by New Plantation on the liquidation was $228,376.12. New Plantation otherwise properly valued the tangible assets on the liquidation. New Plantation's balance sheet on September 30, 1962, was as follows: *10
September 30, 1962
ASSETS
Cash
$ 54,038.26
Accounts receivable - trade
$36,570.71
Allowance for bad debts 3,000.00 33,570.71
Accounts receivable - other
229,050.25
Inventories
184,936.04
Prepaid expenses
24,901.80
Employees' advances
1,705.66
Travel advance
500.00
Machinery and equipment
391,028.50
Truck
525.00
Office equipment
18,733.00
Leasehold improvements
37,374.50
Non-compete agreements
242,500.78
Long-term lease 42,463.31
$1,261,327.81 LIABILITIES
Notes payable - current installments
$ 221,446.00
Due to factor
83,362.83
Accounts payable - trade
55,279.89
Accrued salaries, wages, and commissions
8,329.80
Accrued payroll taxes and taxes withheld from employees
12,840.46
Accrued bonus and vacation pay
12,822.44
Accounts payable to former stockholders
4,708.62
Accrued state and local taxes
3,079.39
Federal and state taxes on income
92,383.11
Long-term debt
762,075.27
Common Stock 5,000.00
$1,261,327.81
*189 In each of its returns for its taxable years ended September 30, 1963 through September 30, 1966 New Plantation deducted approximately one-tenth of the $242,500.78 allocated to the "non-compete agreements." In the notice of deficiency addressed to New Plantation for its taxable years ended September 30, 1963 through September 30, 1966, inclusive, the respondent disallowed the deductions claimed by New Plantation for amortization of these agreements. In the notice of deficiency addressed to Mr. and Mrs. Jemison for the calendar year 1963, respondent determined that the taxpayers realized dividends in the amount of $184,274.23 on account of the following payments by Old Plantation: Payment of non-interest bearing note due 3/14/63
$50,000.00
Payment of non-interest bearing note due 6/15/63
50,000.00
Payment of 5 1/2% note due 10/1/63
50,000.00
Payment of interest on 5 1/2% note due 10/1/63
35,543.31
Payment on account of 5 1/2% note of minority stockholder on 10/24/63 730.92
Total
$184,274.23
The respondent allowed a deduction of $33,543.31 as an offset against the $33,543.31 interest payment that was included in the taxpayers' income. However, a portion *190 of the $730.92 payment represented interest, and the respondent allowed no offset for the interest portion of that payment. Opinion Issue 1. Guaranteed Debt The respondent took the position in the notices of deficiency that, in substance, both the 6 1/2 percent debentures issued to Bradford and Co., Inc. and the 5 1/2 percent serial notes issued to the shareholders of Old Plantation represented indirect contributions by Mr. Jemison to New Plantation's capital account. 824 Based on that position the respondent disallowed the deductions claimed by New Plantation for its taxable years ended September 30, 1963 through September 30, 1966 with respect to the interest paid on those obligations on the theory that the payments were dividend distributions to Mr. Jemison. The respondent also determined that payments of principal made by New Plantation in calendar 1963 on the non-interest bearing notes and the 5 1/2 percent serial notes issued to the shareholders of Old Plantation, and the payments made in calendar 1963 on the cancellation of the 5 1/2 percent serial note held by Mr. H. Ferrell Jernigan were dividend income to Mr. Jemison in that year. Although the respondent included *191 the interest payments made by New Plantation in calendar 1963 on the 5 1/2 percent serial notes in Mr. Jemison's income, the respondent also allowed an offsetting interest deduction on the theor that the interest payments were made on behalf of Mr. Jemison, who, insofar as economic realities were concerned, was the one to whom Bradford and Co., Inc. and the sellers extended credit. No principal payments on the debentures issued to Bradford and Co., Inc. are called for until 1974. The respondent states on brief that he did not include any of the interest payments made by New Plantation on these notes in Mr. Jemison's income due to the fact that any increase would be offset by a corresponding interest deduction. The respondent based his adjustments on the theory that Mr. Jemison could not avoid the traditional debt-equity concepts by causing loans to be made to New Plantation on the basis of his guarantee of those loans. Due to the fact that the 6 1/2 percent debentures issued to Bradford and Co., Inc. were not guaranteed obligations, the respondent conceded on brief that the interest accrued by New Plantation on those notes was deductible. The respondent also conceded that the principal *192 payments on the non-interest bearing notes did not result in dividend income to the Jemisons. This concession is consistent with our finding below that the purported sale of the metal office chair business to New Plantation in consideration of 15 non-interest bearing notes aggregating $183,435.84 and the simultaneous sale of that business to Messrs. Thomas E. and William C. Jernigan are to be disregarded. Due to the concessions by the respondent, New Plantation's deductions for interest expenses for its taxable years ended September 30, 1963 through September 30, 1966 are in issue only to the extent of the interest accrued on the 5 1/2 percent serial notes issued to the shareholders of Old Plantation, and the additions to the Jemisons' income are in issue only to the extent of the payments made on those notes during calendar 1963. For the reasons expressed below, we sustain the respondent's determination that New Plantation was not entitled to an interest deduction with respect to payments made on the 5 1/2 percent serial notes issued to the shareholders of Old Plantation and that Mr. Jemison realized dividend income on the payment of these notes. However, in addition to the offset *193 for the interest payments allowed by the respondent, Mr. Jemison is to be allowed an offset to the extent, that the payment made to Mr. H. Ferrell Jernigan on October 24, 1963 represented accrued interest. All of the steps taken by Mr. Jemison and the shareholders of Old Plantation were components of a single transaction, the end result of which was a purchase by New Plantation of the wrought iron furniture business conducted by Old Plantation for a total consideration of $709,878.33 consisting of $100,000 in cash plus notes in the amount of $609,878.33. Applying the principle that tax consequence must turn upon the substance of a transaction, the purported sale of the metal office chair business to New Plantation in consideration of 15 non-interest bearing notes aggregating $183,435.84, and the simultaneous sale of that business to Messrs. Thomas E. and William C. Jernigan in consideration of a non-interest bearing note in the principal amount of $183,435.84 must be disregarded. Commissioner v. Court Holding Co., 324 U.S. 331 (1945); West Coast Marketing Corp., 46 T.C. 32 (1966). Mr. Jemison caused New Plantation to be organized to purchase the wrought *194 iron furniture business. As New Plantation was without significant capital, the purchase had to be financed through borrowings from Bradford and Co., Inc. and the sellers. The greater portion of the borrowing took the form of purchase money notes that were issued to the sellers. Mr. Jemison personally guaranteed these notes. He also caused the Jemison Investment Co., Inc., of which he was the controlling, if not the sole, stockholder, to guarantee these notes. 825 The sellers made an independent investigation of Mr. Jemison's credit prior to the sale. This Court has recognized that the fact that advances are made in the form of guaranteed debt, rather than direct loans, does not negate their treatment as capital contributions. Santa Anita Consolidated, Inc., 50 T.C. 536 (1968). When advances take the form of guaranteed debt, whether such debt is to be treated as an indirect capital contribution by the guarantor depends upon a consideration of the facts in the light of traditional debt-equity guidelines. Santa Anita Consolidated, Inc., supra; cf. Ackerson v. United States, 277 F. Supp. 475 (W.D. Ky. 1967). In determining whether a *195 debt in form is to be considered as an equity interest for tax purposes, the courts have looked to the adequacy of initial capital, Tyler v. Tomlinson, 414 F. 2d 844 (C.A. 5, 1969); whether expectation of repayment was tied to the success of the business, Gilbert v. Commissioner, 248 F. 2d 399 (C.A. 2, 1957), remanding a Memorandum Opinion of this Court; whether outside sources would have made the advances under the facts presented, Nassau Lens Co. v. Commissioner, 308 F. 2d 39 (C.A. 2, 1962); whether security was given; whether the notes were subordinated to other indebtedness, Montclair, Inc. v. Commissioner, 318 F. 2d 38 (C.A. 5, 1963); the extent to which the initial advances were used to acquire capital assets, Janeway v. Commissioner, 147 F. 2d 602 (C.A. 2, 1945); the form of the instruments, Montclair, Inc. v. Commissioner, supra; and whether any repayments were made, Foresun, Inc. v. Commissioner, 348 F. 2d 1006 (C.A. 6, 1965), affirming 41 T.C. 706 (1964). No single factor is controlling and each case must be decided upon its own peculiar facts. John Kelley Co. v. Commissioner, 326 U.S. 521 (1946); *196 Gooding Amusement Co., 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956); Emanuel N. (Manny) Kolkey, 27 T.C. 37 (1956), affd. 254 F. 2d 51 (C.A. 7, 1958). After a consideration of these criteria and ascribing to each the weight which appears to us to be proper under the circumstances here present, we are of the view that the guaranteed debt must be treated as an indirect capital contribution to New Plantation by Mr. Jemison. As the 5 1/2 percent serial notes ran to the shareholders of Old Plantation rather than to Mr. Jemison directly, it is to be expected that the instruments would have a fixed rate of interest and fixed maturity dates. Payments were actually made in accordance with the terms of the instruments. However, in light of Mr. Jemison's guarantee there was little question as to payment. Accordingly, we believe that the advances should be judged on the factors that existed at the time the advances were made. The fact that the notes were entirely conventional in form, rather than hybrid securities with some of the characteristics of an equity issue, does indicate the intention to create a debt interest. However, *197 the question is whether the intent and acts of the parties should be disregarded in characterizing the transaction for Federal tax purposes. See United States v. Snyder Brothers Company, 367 F. 2d 980 (C.A. 5, 1966); Berkowitz v. United States, 411 F. 2d 818 (C.A. 5, 1969); Tyler v. Tomlinson, supra. The 5 1/2 percent serial notes issued to the sellers, except those notes maturing on October 1, 1963 and October 1, 1964 were subordinated to all indebtedness other than the debentures issued to Bradford and Co., Inc. The subordination of these notes to all indebtedness incurred in the past or future operation of the business subjects the notes to the same risks as an equity interest. See Tomlinson v. 1661 Corporation, 377 F. 2d 291 (C.A. 5, 1967); Tyler v. Tomlinson, supra. More importantly, the corporate assets were wholly inadequate to sustain a debt of $609,878.33; the parties understood that it would likely go higher; and substantial portions of these funds were used for the purchase of capital assets and for meeting expenses needed to commence operations. United States v. Henderson, 375 F. 2d 36 (C.A. 5, 1967); *198 Tyler v. Tomlinson, supra.
New Plantation was started with capital surplus limited to $5,000 of common stock. By comparison, long-term debt, consisting of the notes issued to Bradford and Co., Inc. and the 5 1/2 percent serial notes issued 826 to the sellers, exceeded $750,000. Considering only long-term debt, New Plantation began with a 125 to 1 debt-equity ratio. The petitioners argue that for the purposes of computing the debt-equity ratio, the debentures issued to Bradford and Co., Inc. should be treated as equity as those obligations were subordinated to the serial notes issued to the sellers. However, while making this argument, the petitioners also argue that the advance by Bradford and Co., Inc. must otherwise be considered bona fide debt. On the record before us, we concluded that Bradford and Co., Inc. did not make a contribution to the capital of New Plantation when it made this advance. Without evidence that Mr. Jemison guaranteed the repayment of this advance, there is no basis for considering the debentures as representing an indirect equity advance by him. These notes must be considered debt for all purposes, and therefore we reject the petitioner's *199 suggestion that the advance by Bradford and Co., Inc. should be treated as equity for the purposes of computing the debt-equity ratio. The parties realized that New Plantation would require additional financing for its operations as the long-term debt was almost entirely devoted to the acquisition of the assets of the wrought iron furniture business. This is made clear by the following testimony given by Mr. Jemison: I think that the Jernigans could have solved their problem of protection and security to a large degree by having a mortgage on the physical properties and on the receivables and inventories, but this would have hamstrung New Plantation Patterns which had to arrange financing both with its factor for an over line and with the bank, and this would have completely hamstrung the operation of New Plantation Patterns. The corporate assets supporting the debt of $609,878.33 were inadequate. After the dissolution of Old Plantation, the balance sheet of New Plantation showed quick assets (cash and accounts receivable) of approximately $317,000 against current liabilities of approximately $490,000. After the dissolution of Old Plantation, New Plantation had tangible assets, *200 at fair market value, of approximately $1,064,000 securing approximately $1,078,000 of debts. Compare Ackerson v. United States, supra. It has been recognized that the debt-equity guidelines are helpful factors to be considered and not fiats to be bound by. Tyler v. Tomlinson, supra. Certain of these guidelines must be modified for the purposes of this case. The question here is not whether other sources would have made such advances under the facts, but whether any source would have advanced $600,000 in money or property to New Plantation without the personal guarantee of Mr. Jemison. Aside from the guarantee, the expectation of repayment would have been tied solely to the success of the business. Bradford and Co., Inc. did advance $150,000 to New Plantation without the personal guarantee of Mr. Jemison. However, this advance was motivated not by usual business considerations but by Mr. Bradford's desire to obtain an employment opportunity for his son. In answer to the question of whether the employment of Mr. Bradford's son was an inducement to Bradford and Co., Inc. to make this advance, Mr. Jemison testified: Yes, Sir. Mr. Bradford, Mr. Thomas *201 Bradford, the father of John, told me that his son was returning from Berlin where he was serving in the Service and there was not room in his company, Bradford and Company, for his two sons. His oldest son had been then and for several years in Bradford and Company and he was looking around for a connection for his youngest son John. I was in the middle of this discussion and negotiations with Mr. Jernigan at that time, and with Mr. Bradford, as I say, who did wish a place for his son, and this was an inducment to have his son get a position in the company. I'd just like to add he is now a vice president and sales manager and has done an extremely outstanding job. Our conclusion that the advances made in the form of guaranteed debt were in the nature of capital contributions is not precluded by the fact that Mr. Jemison himself was not a shareholder of record of New Plantation. Mrs. Jemison held the stock of New Plantation only by arrangement of Mr. Jemison. For all practical purposes, she must be considered as a donee or nominee of her husband. Advances by other than shareholders of record have been treated as contributions to capital. Foresun, Inc., 41 T.C. 706 (1964), *202 affd. on this issue 348 F. 2d 1006 (C.A. 6, 1965); Sherwood Memorial Gardens, Inc., 827 42 T.C. 211 (1964), affd. 350 F. 2d 225 (C.A. 7, 1965). The same rule must apply to a person who makes indirect advances on behalf of a family member when his actions are clearly not those of an unrelated third party acting in his own best interest. It is obvious that Mr. Jemison would not have guaranteed the obligations of a corporation in which he had no interest. Also, it was made clear at the trial that Mr. Jemison controlled New Plantation's affairs and made the decisions that would be required of the shareholder of record. The petitioners rely heavily on Arthur J. Kobacker, 37 T.C. 882 (1962) and Princess Coals, Incorporated v. United States, 239 F. Supp. 401 (S.D.W. Va. 1965). In the Kobacker case we specifically stated that the assets of the corporation were ample security for the note. Further, the note was not subordinated and the corporation was incorporated with a $175,000 capital investment which was substantial in relation to the $302,500 of debt. Both the facts of the instant case and the arguments advanced *203 by the respondent are different. Under the facts presented in the instant case, the guaranteed advances must be considered as equity under traditional debt-equity principles. Further, the respondent does not contend, as he did in Arthur J. Kobacker, supra, that conditional liability as a guarantor is alone sufficient to subject a shareholder to tax under a constructive dividend theory. It is the general practice of lenders to require guarantees from shareholders of closely held corporations. The guarantee of corporate debt by such shareholders will not affect the tax nature of the indebtedness when the corporation is adequately capitalized. However, where capitalization is inadequate, and the lender must rely on the credit of the shareholders in making the advance, guaranteed debt cannot be used to circumvent the tax consequences that would apply to a direct advance by the shareholders. The petitioners' position is not supported by Princess Coals, Incorporated, supra, as that case did not involve the treatment of guaranteed debt under traditional debt-equity principles. The only question for decision was whether the purchasing corporation was a sham, a *204 question which is not presented in the instant case. The petitioners have attempted to overcome the inadequate capitalization of New Plantation by arguing that the contacts with large department stores that Mr. Jemison contributed to New Plantation's business were sufficient to prevent the corporation from being thinly capitalized. See Murphy Logging Co. v. United States 378 F. 2d 222 (C.A. 9, 1967); Ackerson v. United States, supra. In Murphy Logging Co. v. United States, supra, the ninth circuit found that a corporation organized with nominal capital and substantial guaranteed debt was not thinly capitalized after taking into consideration certain intangibles contributed by the shareholders. These intangibles consisted of the shareholders' ability to get contacts for cutting timber and their reputation in the logging industry. Intangibles placed at the risk of the business as capital contributions must be considered in testing the adequacy of a corporation's capitalization. See George A. Nye, 50 T.C. 203 (1968). However, in order to be entitled to sufficient weight so as to conclude that New Plantation was not inadequately capitalized, *205 the record would have to show the extent of these connections in greater specificity. The petitioners attempt to draw a distinction between shareholder guaranteed debt held by a bank and that held by the shareholders of Old Plantation. However, we see no distinction between a loan of money to purchase a business and credit sale of a business. In both cases there is an extension of credit, in the first case by a lender, and in the second case by the seller. The petitioners point to the fact that Mr. Thomas E. Jernigan was to initially run New Plantation, and he believed that the business would be able to generate the funds with which to service the debt. However, the record indicates that notwithstanding the steady increase shown by the wrought iron furniture business in after tax net earnings, Mr. Thomas E. Jernigan was concerned about receipt of payment for his stock as the sales price was substantially in excess of the book value of Old Plantation. This concern is indicated by the fact that Mr. Jernigan checked Mr. Jemison's credit and required him, as well as Jemison Investment Co., Inc. to guarantee the debt. It is clear that Mr. Jernigan was looking to the credit of Mr. Jemison *206 when the sale was made. The notes were guaranteed by the Jemison Investment Co., Inc. for a fee of $15,000 828 per year. This guarantee, which was in addition to Mr. Jemison's personal guarantee, does not indicate that the sale was based on credit of Jemison Investment Co., Inc. The sellers did not look to Jemison Investment Co., Inc. as an entity separate from Mr. Jemison. The sellers only investigated the credit of Mr. Jemison and their advance of credit was, in substance, made to him not his investment company. The fact that Jemison Investment Co., Inc. was to receive a fee was of no consequence to the sale and does not indicate that the sellers were looking to its credit. The arrangement for the fee was solely a matter for decision by Mr. Jemison, who was in control of both New Plantation and Jemison Investment Co., Inc.
Issue 2. Value of Good Will and Inventory [5]
*207 It is admitted that New Plantation erroneously allocated $242,500.78 of the consideration paid to the sellers to covenants not to compete. This follows from the fact that no separate consideration had been paid for the covenants not to compete but rather the entire consideration had been paid for the stock of Old Plantation. The respondent's position is that the difference between the adjusted basis of the stock determined under section 1.334-1 (c), Income Tax Regs., and the fair market value of the tangible assets must be allocated to good will. The petitioner argues that the value of the good will should be determined under ARM 34, C.B. 2, 31 (1920), rather than under the residuary method that is favored by the respondent. The parties agree as to the fair market value of all the tangible assets received by New Plantation with the exception of the value of the inventory. [6] They also agree that New Plantation properly valued its tangible assets at their fair market value. We have determined that the fair market value of the inventory was $228,376.12. *208 Where both tangible and intangible assets are acquired, the value of good will has frequently been determined under the residual method. See e.g. Merchants National Bank, 6 B.T.A. 1167 (1927); Jack Daniel Distillery v. United States, 379 F. 2d 569 (Ct. Cl. 1967). The valuation of good will under capitalization of earnings method of ARM 34 would result in the valuation of the tangible assets at less than their fair market value. However, it is agreed that the tangible assets received by New Plantation on the liquidation of Old Plantation are to take as their basis their fair market value. Thus, the value of good will must be determined under the residual method by subtracting the value of the tangible assets from the adjusted basis determined under section 1.334-1(c), Income Tax Regs.
Decisions will be entered under Rule 50. Footnotes
1. In its return for its taxable year ended September 30, 1966, Plantation Patterns, Inc. reported a net operating loss in the amount of $161,973.07. After making adjustments in the taxpayer's income for that year, the respondent determined that the taxpayer had a net operating loss in the amount of $103,465.89 and allowed that loss as a net operating loss carryback to its taxable year ended September 30, 1963.↩
2. All section references are to the Internal Revenue Code of 1954, as amended.↩
3. In turn, Messrs. Thomas E. and William C. Jernigan agreed to purchase the assets of the United Chair Division for the same amount payable on the same terms.↩
4. There is an unexplained difference of $0.50 between amount accrued ($37,756.19) and amount disallowed ($37,756.69).↩
A. Note A - These items are considered as "cash or its equivalent" for purposes of the computation on Exhibit B-1.↩
**. Combined with machinery and equipment on books of liquidating corporation. ↩
5. The respondent recognized that if we viewed the guaranteed debt as an indirect capital contribution, it could be argued that sec. 334(b)(2) was inapplicable as it could be said that the real purchaser of the stock was Mr. Jemison and that New Plantation acquired such stock as a capital contribution. See sec. 334(b)(3)(A). However, the respondent specifically chose not to raise this issue.↩
6. It is also conceded that petty cash is the only item that falls within the definition of "cash or its equivalent." See secs. 1.334-1(c)(4) (v)(b)(1) and 1.334-1(c)(4)(viii), Income Tax Regs.; Boise Cascade Corporation v. United States, 288 F. Supp. 770↩ (S.D. Idaho 1968).