PENSACOLA GREYHOUND RACING, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pensacola Greyhound Racing, Inc. v. Commissioner
Docket No. 5942-71.
United States Tax Court
T.C. Memo 1973-225; 1973 Tax Ct. Memo LEXIS 62; 32 T.C.M. (CCH) 1064; T.C.M. (RIA) 73225; October 11, 1973, Filed *62 Petitioner purchased a dog track racing facility in Pensacola, Fla., for a lump sum in December 1965. The assets acquired included the dog racing plant, the land on which it was located, and intangible assets including a racing permit and liquor license. The parties made no allocation of the purchase price to the various assets acquired. Held, proper allocation of the lump-sum purchase price to the various depreciable and nondepreciable assets determined; useful lives of depreciable assets also determined. Held, petitioner may not deduct contribution made in 1968 to the Miami Beach Chamber of Commerce. Hugh R. Dowling and John W. Mooers, for the petitioner. Vernon J. Owens, for the respondent. 2 DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNAN, Judge: The Commissioner determined deficiencies in petitioner's corporate income tax for its fiscal years ending October 31, 1966, 1967, and 1968 as follows: 1966
$66,747.82
1967
51,922.30
1968
51,004.02
The principal issue is the amount of depreciation allowable on petitioner's dog track racing facility which petitioner purchased for a lump sum in December of 1965, which requires us to decide what part of the lump-sum purchase price *63 is allocable to the tangible depreciable assets and what part is allocable to the nondepreciable tangible assets and to the intangible assets; and also the useful lives of the depreciable assets. Also at issue is whether a $980 contribution paid to the Miami Beach Chamber of Commerce in 1968 is deductible as an ordinary and necessary business expense. FINDINGS OF FACT The stipulated facts and attached exhibits are incorporated herein by this reference. Petitioner, Pensacola Greyhound Racing, Inc., is a corporation incorporated under the laws of Florida on November 18, 1965. Its principal place of business at all relevant times herein was Pensacola, Fla. Petitioner filed its Federal corporate income tax returns on a fiscal year 3 basis ending on October 31 of each year. For its fiscal year ending October 31, 1966, petitioner filed its returns with the district director of internal revenue in Jacksonville, Fla.; and, for the subsequent 2 years in issue petitioner's returns were filed with the internal revenue service center, Chamblee, Ga.
On December 15, 1965, petitioner purchased the greyhound racing plant in Escambia County, Fla., from Florida Greyhound Racing, Inc. (hereinafter *64 sometimes FGR) for $2,010.000. The purchase price included a second mortgage to the seller of $400,000 which was acquired by petitioner and six of its stockholders for $325,000 shortly after the date of the purchase. The petitioner's share of the $75,000 discount on the second mortgage was $25,000. The discount reduced petitioner's cost basis in the racing plant to $1,985,000. The agreement of sale made no allocation of the purchase price among the assets transferred. Subsequent to the purchase, it became the job of petitioner's accountants, who had also kept the books of FGR, to allocate the purchase price to the various assets acquired in order to compute depreciation for the depreciable assets. The method by which the accountants assigned portions of the purchase price to the various assets involved a 4 two-step procedure. First, the following assets were assigned the following values: Land
$50,000
Equipment
96,434
New dog kennels
90,000
The land had recently been acquired by FGR FOR $50,000; the kennels had recently been constructed by FGR FOR approximately $90,000; and the equipment, being readily replaceable on the market, was valued at net book value on FGR's books. The parties *65 are in substantial agreement on the values assignable to these items. In the second step, the accountants used a percentage formula approach to assign a portion of the purchase price to the remainder of the assets acquired. Under the percentage formula approach, the accountants obtained the aggregate cost (or value assigned) of the same assets to FGR when it purchased the plant in 1959, and subsequently made additions or improvements thereto, and, without reducing the costs of any of the assets for depreciation or obsolescence, they determined a ratio of the cost of the individual assets to the aggregate cost of all of those assets and applied it to the purchase price paid by petitioner, reduced by the value allocated to the assets in the first step. In this manner, the cost basis of the assets valued in the second step were all given the same 5 proportionate increases. The accountants made no attempt to determine the actual fair market value of any of the assets acquired. The allocations thus made by the accountants, and which were used by petitioner as its basis for depreciation purposes, were as follows: Grandstand
$ 653,618
Clubhouse
227,389
Clubhouse air conditioning
80,625
Miscellaneous buildings
108,636
Track
142,607
Power wiring
135,521
Transformers
13,329
Water system
28,343
Fences
3,801
Parking lot and roads
99,825
Yard
73,471
Other tangible property
19,312
$1,586,477
Additionally, *66 using the percentage formula, petitioner assigned a value of $162,089 to its intangible assets. The intangible assets consisted largely of a racing permit, racing license, liquor license, and goodwill. [1] The total of the values thus assigned to the various assets was $1,985,000, the net purchase price. 6 Petitioner also determined useful lives for the depreciable property for purposes of calculating its annual depreciation deduction. All of the buildings and improvements that were part of the facility were given a 12-1/2-year useful life, except the kennel compound which, having been built recently, was given a 20-year useful life. Petitioner attributed an 8-year useful life to all of the equipment that was used in the operation of the facility. With the purchase of the dog track facility in 1965, petitioner acquired *67 three intangible assets which were essential to the successful operation of the plant; a racing permit, a racing license, and a liquor license. Under Florida law applicable to the years in issue, dog track owners were required to have a racing permit and racing license both issued by the then Florida Racing Commission (now Division of Pari-Mutuel Wagering, Board of Business Regulation, State of Florida) to operate. The racing permits were issued for an indefinite period subsequent to the approval of an application for a permit by the county electorate in a special referendum held where the facility was to be located. Each permit was issued with respect to a particular tract of land and entitled its owner to be free from competing dog tracks for a 100-mile radius in every direction. Transfers of racing permits were not possible without the permission of the Florida Racing Commission, 7 but were customarily approved upon the sale of a greyhound racing plant. Racing licenses were issued annually to dog track owners who had valid permits, at which time the Florida Racing Commission would designate or approve the annual racing season for the track concerned. Racing licenses were customarily *68 renewed on an annual basis. The liquor license purchased by petitioner as part of the dog track business was a caterer's license, renewable on an annual basis as a matter of course. The license permitted petitioner to make liquor sales only within the track enclosure and restricted the sales to a period beginning 10 days before and ending 10 days after the racing season. The liquor license could not be sold apart from the business. The greyhound racing plant purchased by petitioner on December 15, 1965, was started in Pensacola, Fla., in 1946 by the Pensacola Kennel Club which constructed or purchased depreciable assets during its ownership of the facility at a cost of $361,220.39. When Pensacola Kennel Club sold the plant to FGR IN 1959, FGR assigned $885,284.41 of the purchase price to the depreciable property in existence at that time and apparently assigned $113,661.32 of the purchase price to the racing permit. [2] During its period of 8 ownership from 1959 to 1965, FGR purchased or constructed additional depreciable assets at a cost of $468,445.23. During the approximately 12 years of its ownership of the plant Pensacola Kennel Club claimed depreciation deductions in the *69 aggregate amount of $177,540.86. During the approximately 6-1/2 years that FGR owned the facility it claimed depreciation deductions in the aggregate amount of $783,680.96. FGR sustained net operating losses of sizeable proportions in each of the 6 years directly preceding its sale of the racing plant to petitioner. Petitioner realized a net profit from operating the racing facility in each of its first 3 years of operations, which are the years here involved. In July 1968 the American Greyhound Track Operators Association, a national association of greyhound track owners, through its Florida division, made a pledge of $25,000 to the Florida program to host the Republican National Convention in Miami Beach, Florida. An assessment was made against each member of the Association in Florida, based on the percentage of the gross receipts from all of the tracks. Petitioner's assessment was $980, and in compliance with the assessment, petitioner issued a *70 check in the amount of $980 to the Miami Beach Chamber of Commerce on July 19, 1968. 9 On its returns for its fiscal years ending on October 31 in 1966, 1967, and 1968, petitioner claimed depreciation deductions in the amounts of $222,915, $197,982, and $182,281, respectively. Except for minor additions made to the racing plant subsequent to December 15, 1965, the depreciation deductions were attributable to the plant and equipment purchased from FGR, and were based on the values assigned to the various assets in petitioner's two-step percentage formula. Petitioner did not deduct any depreciation on the intangible assets. Additionally, in its return filed for its fiscal year ended October 31, 1968, petitioner deducted $980 for its contribution to the Miami Chamber of Commerce, as an ordinary and necessary business expense. In his notice of deficiency dated June 9, 1971, respondent determined that petitioner's allowable depreciation deductions for its taxable years 1966, 1967, and 1968 were $83,857.95, $89,810.29, and $85,111.58, respectively. Respondent's determination of allowable depreciation was also based on an allocation of the lump-sum purchase to the various assets required *71 as made in a valuation report prepared by an appraiser with the Valuation Analysis Branch of the Internal Revenue Service in Washington who visited the plant and discussed values with various appraisers in the Pensacola area. This appraiser used what he described 10 as a residual approach to the allocation problem under which he estimated the reproduction cost of the depreciable assets, reduced that figure for depreciation incurred to the date of purchase, which resulted in the allocation made to the depreciable assets, and then allocated the residue of the lump-sum purchase price among the nondepreciable tangible assets and the intangible assets. Relying principally on this appraisal, respondent allocated the $1,985,000 purchase price to the various assets that comprised the racing plant as follows: Grandstand )
$ 458,565
Clubhouse )
Air conditioning - Clubhouse)
Scale House
10,080
Lockout Kennels
3,600
Miscellaneous buildings
8,155
Kennel compound
89,280
Dog track
26,136
Power wiring)
Transformers
81,867
Water system
15,588
Fences
3,801
Parking lot and roads
10,125
Yard
14,800
Neon signs and road advertising
[1] *72 10,253
Equipment (summarized)
93,372
Land
50,000
Racing permit, racing license, goodwill, and other intangibles
1,084,378
Liquor license
25,000 Additionally, respondent determined that the remaining useful lives of the depreciable assets that comprised the racing plant were as follows: 11 Grandstand
15 years
Clubhouse
15 years
Air conditioning - Clubhouse
15 years
Scale House
15 years
Lockout Kennels
15 years
Miscellaneous buildings
12-1/2 years
Kennel compound
25 years
Dog track
12-1/2 years
Power wiring
12-1/2 years
Transformers
12-1/2 years
Water system
12-1/2 years
Fences
12-1/2 years
Parking lot and roads
12-1/2 years
Yard
12-1/2 years
Neon signs and road advertising
12-1/2 years
Equipment
8 years
In the notice of deficiency respondent determined allowable depreciation by using the above figures as petitioner's basis for depreciation of the depreciable assets and using the above useful lives. Respondent did not allow any depreciation on the intangible assets. Respondent also disallowed as a deduction the $980 contribution to the Miami Beach Chamber of Commerce. OPINION The principal issue in this case concerns the proper allocation of the $1,985,000 purchase price paid by petitioner for a greyhound dog racing facility in Pensacola, Fla., among *73 the plant's depreciable and nondepreciable assets. The primary nondepreciable assets inhering to the facility are the land, over which there is no dispute as to proper value, and certain intangible assets which may include a racing permit and license, a liquor license, and goodwill. 12 The basic controversy stems from respondent's reductions to petitioner's depreciation deductions claimed in regard to the plant's depreciable assets, and we are given the task of resolving the strictly factual dilemma of what portion of petitioner's total purchase price is properly attributable to those assets.
Petitioner's basis for depreciation of the depreciable assets acquired in this transaction is its cost. Secs. 167(g), 1011, and 1012, I.R.C., 1954. Since petitioner's cost in this situation is what petitioner paid for the assets, and since the depreciable assets were acquired as part of the entire racing facility which included nondepreciable assets with no specific sum being paid for any specific asset, it is necessary to allocate the lump-sum purchase price among the various assets acquired in order to determine the proper basis for depreciation of the depreciable assets. The allocation of *74 a lump-sum price among the various components of a facility such as this dog racing facility is at best a "guestimate." Without doubt both the depreciable and the intangible nondepreciable assets are partially responsible for the value of the facility as a whole but, being for the most part special-purpose-type assets, the value of both the tangibles and the intangibles are so 13 dependent on the successful operation of the dog racing enterprise that one would have little value without the other. Thus, where a purchaser pays an appreciated lump-sum price for the whole, it seems apparent that it is paying an appreciated price for each of the components, and actual original cost of the various components has little to do with a proper allocation of the purchase price except possibly as a measuring stick. From the evidence presented in this case we must assume there is no truly "accepted" method of allocating values among the various components of a dog track racing facility. Petitioner's representatives used one method by which they attempted to allocate the inflated purchase price according to the percentages each component of the plant bore to the total cost shown on the books of *75 its transferor. This method was apparently devised by petitioner's accountants, who were certainly not qualified racetrack appraisers, but it does have the merit of consistency. The accountants' allocation to the tangible assets was supported by an appraisal made by an architect somewhat knowledgeable about the cost of racetrack facilities, whose cost figures were supported by other qualified witnesses, but that appraisal was of the reproduction cost new of those assets, unreduced by depreciation or obsolescence. Certainly a 20-year-old plant would seem to represent a lesser share of the total cost than would a new and modern plant. 14 On the other hand respondent offered the evidence of its appraisal expert, who was certainly qualified as an appraiser but who had never appraised a racetrack facility before. His approach to the allocation problem was to estimate the reproduction cost new of the tangible assets and discount those figures by various percentages, averaging about 45 percent, to account for depreciation and obsolescence of the plant as of the date it was acquired by petitioner. The resulting net figures were then used as petitioner's basis for depreciation and the residue *76 of the purchase price was allocated to the land, the value of which the parties agree upon, and to intangible assets consisting of a racing permit, a racing license, a liquor license, and goodwill. A value of $25,000, determined by multiplying the gross liquor sales of one week by 10, was assigned to the liquor license, and the balance of $1,084,378 was assigned as the cost of the other intangibles. As a result of these different approaches to the allocation problem petitioners assigned a total of $1,772,911 to the depreciable assets, $50,000 to the land, and $162,089 to all of the intangibles, while respondent assigned a total of $825,622 to the depreciable assets, $50,000 to the land, and $1,109,378 to the intangibles, including the liquor license. Such discrepancies cast considerable doubt 15 on the expertise of both groups of appraisers and the validity of both methods of making the allocation. Nevertheless, not claiming expertise in this field ourselves, we are limited to the evidence presented in our quest for a reasonable allocation of the purchase price. We have searched the case law for an opinion involving a similar factual setting and have had little luck with the exception *77 of Tanforan Co. v. United States, 313 F. Supp. 796 (N.D. Cal. 1970), affirmed per curiam 462 F.2d 605 (C.A. 9, 1972), cited by petitioner, which we find to be of only incidental benefit. Therefore, since each valuation case is destined to turn on its particular facts and circumstances, given the application of certain legal principles, we have valued the assets of Pensacola Greyhound Racing, Inc., on the evidence we have found to be pertinent and realistic. Schulz Baking Co., 3 B.T.A. 470 (1926). Possibly the first step in approaching this problem is to identify what intangible assets of value were received by petitioner when it purchased the dog track. Respondent alleges that petitioner received a racing permit, racing license, liquor license, and goodwill. Petitioner, on the other hand, vigorously defends its position that the racing permit was the only intangible asset of value received in the transaction. We feel that this agrument is pretty much an exercise in semantics because the evidence indicates 16 that the two licenses would usually be issued without question to the owner of the racing permit; and whether it is termed goodwill or something else, we believe the monopolistic *78 type of racing permit here involved carries with it an intangible value of considerable magnitude. We think, and there is authority to support us, that whenever there is a monopoly situation such as there was here, where no other dog tracks could operate within 100 miles of petitioner's track, the value of goodwill in the traditional sense is negligible. See Des Moines Gas Co. v. Des Moines, 238 U.S. 153 (1915), wherein goodwill was defined as "that element of value which inheres in the fixed and favorable consideration of customers, arising from an established and well-known and well-conducted business * * *." The reputation of the former operator of the track might encourage or discourage potential customers in going to the dog races, but if they want to go to the dog races in the Pensacola area, they have no alternative but to become customers of petitioner. Furthermore, there would be no way to accurately measure the value of goodwill here, if any there was, because the racing facility had operated at a loss during the 5 or 6 years prior to petitioner's purchase. Nevertheless, we think the fact that the racing permit gave petitioner a monopoly on dog racing in the area, which *79 it could apparently hold as long as it operated the 17 track properly, warrants allocating a considerable portion of the purchase price to the intangibles; but we see no need to value them separately. The next question is which of the parties' methods of allocation will give the more realistic and accurate reflection of the proper values to be attributed to the various components of the dog track facility. We agree with the parties that the combined cost replacement and residual appraisal method may be appropriately utilized here, for it is an acceptable alternative where the income and the comparative sales methods are not useful. Jack Daniel Distillery v. United States, 379 F.2d 569 (Ct. Cl. 1967); Merchants National Bank, 6 B.T.A. 1167 (1927). [4] *80 However, we believe the valuation estimates computed under this method serve only as a strong suggestion of what the proper values should be, the accuracy of which may vary according to the facts and circumstances of the particular case. Georgia Ry. v. R.R. Comm., 262 U.S. 625 (1923); Philadelphia Steel and Iron Corp. v. Commissioner, 344 F.2d 964 (C.A. 3, 1965), affirming T.C. Memo. 1964-93. We do not believe the percentage approach utilized by petitioner to allocate the purchase price correctly reflects the appreciation of each of the assets because it is based entirely on book values, some of which we find to be 18 arbitrary. This leaves us with respondent's method of allocation, which we have used with some modifications. We think both parties have overstated their cases, and, as a result, have exaggerated their appraisals. From the evidence we have detected some flaws in each of the appraisals which we think to some degree impair their accuracy. Therefore, in making our determination, we have refused to choose between alpha and omega, as the parties would have us do, for we believe the answer lies somewhere between the two extremes. Without dwelling unduly on those infirmities, we note that petitioner's appraisal fails to consider the 1965 fair market value of the individual assets and, therefore, gives no weight to the relative appreciation enjoyed by each asset; it makes no adjustment for physical or functional obsolescence; and it gives no consideration to the plant as a going concern. On the other hand, respondent's estimate fails to consider the losses suffered *81 by petitioner's predecessor and consequently overemphasizes any goodwill which might have been transferred in the sale; it places undue importance on the liquor license as a separate valuable intangible asset; and it overestimates the amount of depreciation that should be attributable to the fixed assets which comprise a major part of the entire facility. Given the testimony of petitioner's witnesses that constant 19 renovation is done at most dog tracks, we believe respondent's depreciation component is too high, particularly when the resulting allocation places a very large value on the racing permit and other intangibles which have a value only so long as the physical plant is useful. Furthermore, the testimony of Pratt Martin, a local appraiser, indicated that because the bone structure of the principal buildings is concrete, they have an indefinite life and by his estimate had depreciated in real terms only 17 percent by 1965. Rockford Malleable Iron Works, 2 B.T.A. 817 (1925). Tempering his depreciation estimate with the fact that not all of the depreciable assets were constructed of concrete and with other facts available in the record as a whole, we think the proper depreciation *82 factor should be nearer 25 percent. Taking the above factors into consideration and in light of all of the evidence presented, we have done the best we could to make a reasonable allocation of the purchase price among the various assets acquired by petitioner. Our computation produces a total value of $1,157,200 for all of the tangible assets, including the land, which can be factorized as follows: 20 Principal buildings
$ 625,500
Scale house
15,100
Lockout kennels
3,600
Miscellaneous buildings
12,200
Kennel compound
90,000
Tote board
3,300
Land
50,000
Equipment
96,000
$ 895,700
Other tangible property:
Electrical wiring
$ 111,650
Track
72,500
Water system
21,250
Fences
3,800
Parking lot & roads
19,400
Yard
18,400
Signs
14,500
261,500
$1,157,200 We find that the above values are properly attributable to each of the tangible assets listed above and further, that the remainder of the purchase price, $827,800, is attributable to the racing permit and other intangible assets. Turning now to the question of the proper useful lives to be attributed to the various depreciable assets concerned herein, we note that there are only minor disparities between the positions of each party. There is agreement with regard to the *83 proper useful lives of all the equipment at the dog track and of all the improvements except six principal assets. Respondent determined the grandstand, clubhouse, air conditioning system, scale house, and lockout kennels each had a useful life of 15 years in 1965. He also determined that the new kennel compound had a useful life of 25 years as of that date. With respect to the same items, 21 petitioner had attributed a 20-year useful life to the new kennel compound and a 12-1/2-year useful life to each of the remaining assets in contention. We think that respondent must prevail on this issue for his determination bears a presumption of correctness which has not been placed in doubt by any evidence adduced at trial. Easter v. Commissioner, 338 F.2d 968 (C.A. 4, 1964). Moreover, the evidence adduced by petitioner, i.e., that the dog track is continually undergoing renovation and that the grandstand's concrete bone structure gives it an indefinite life, tends to support respondent's argument for longer useful lives. Petitioner thus having failed to carry his burden of proof, we sustain respondent's determination of the useful lives of the various assets. Likewise, we hold that *84 petitioner is not entitled to a business expense deduction under section 162 for the $980 it paid to the Miami Beach Chamber of Commerce in 1968. Here, again, the determination of the respondent is presumed correct unless proved otherwise by petitioner's evidence. We can find no evidence in the record that establishes a direct connection between petitioner's contribution to a Chamber of Commerce over 650 miles from Pensacola and its 22 business activities in Pensacola.Accordingly, we are unable to find that the contribution was an ordinary and necessary business expense. Decision will be entered under Rule 50. Footnotes
1. FGR's balance sheet as of October 31, 1965, listed current assets of $22,369.10, land at $50,000, plant and equipment at a cost of $1,307,523.23 less depreciation of $783,680.96 for a net book value of $573,842.27, and a racing permit at $113,661.32. It also reflected liabilities totaling $918,243.75, capital stock at $250,050.00, and a surplus deficit of $457,671.06. ↩
2. There is no reliable evidence of the price FGR paid for the plant but apparently it was a lump sum which was allocated to the various individual assets in much the same way the allocation was made by petitioner as described above. ↩
1. An addition of $597 was made to this item to agree with the total determined value for other tangible property.
4. Plantation Patterns, Inc., T.C. Memo. 1970-182.