CASCO BANK & TRUST CO. et al.,
Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 76–1051.

United States Court of Appeals,
First Circuit.

Argued April 7, 1976.
Decided Sept. 21, 1976.

Roger A. Putnam, Portland, Me., with whom Thomas J. Van Meer, Charles A. Harvey, Jr., Verrill, Dana, Philbrick, Putnam & Williamson, Portland, Me., were on brief, for appellants.

William A. Whitledge, Atty., Tax Div., Dept. of Justice, Washington, D. C., with whom Scott P. Crampton, Asst. Atty. Gen., Washington, D. C., Peter Mills, U. S. Atty., Portland, Maine, Gilbert E. Andrews, Elmer J. Kelsey and James E. Crowe, Jr., Attys., Tax Div., Dept. of Justice, Washington, D. C., were on brief, for appellee.

Before COFFIN, Chief Judge, and McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Plaintiffs, executors of the estate of William A. Preston, Jr., brought this action for a refund of $57,431.57 in tax and interest assessed against Preston by the Commissioner for the calendar years 1968 and

1971.[1] At issue are deductions claimed by the taxpayer for a business bad debt and for a loss on the worthlessness of § 1244 corporate stock. On the business bad debt question, a jury found for plaintiffs but a judgment n. o. v. was subsequently entered for the Commissioner by the district court. The § 1244 stock issue was heard on cross-motions for summary judgment and was also decided in the Commissioner's favor.

Plaintiffs appeal from both judgments. On the § 1244 stock issue, after consideration of the briefs and arguments, we are satisfied that the reasoning of the district court was correct. We therefore affirm on the opinion below. We shall address ourselves herein solely to the issue of the claimed bad debt deduction.

### I.

William A. Preston entered the construction business in 1946 and two years later formed a partnership with William E. Maloney, Jr., entitled Maloney & Preston (M & P). The partnership was dissolved in 1964 and Preston continued to operate the business as a sole proprietorship, specializing in the construction of public facilities. He incorporated the business in 1968, contributing an initial capital investment of $20,000, but retained certain assets in his own name. Fifty-three shares of stock were issued: fifty-one to Preston and one each to his wife and attorney. In 1971 Preston contributed $13,752 worth of equipment to M & P which was entered in the corporation's books as paid-in capital. Both he and wife were employed full-time by M & P from September, 1968, until November, 1971. Preston ran the business and Mrs. Preston served as the bookkeeper.

Preston was the principal force behind M & P. He did the pricing and bidding for the corporation's contracts and oversaw to a certain extent the work in progress. He was also in charge of M & P's financial affairs: he handled its capital investments, loan accounts, and lines of credit, and he authorized payment of its bills. In 1968, he reported $220,277.13 income, primarily from the net profits of the sole proprietorship. After M & P was incorporated, Preston's salary was set at $1,000/month for the first three months, and $5,000/month thereafter. He reported $56,050 salary and $45,206 other income [2] on his income tax return for the calendar year 1969; $31,400 salary in 1970; and $13,600 salary in 1971.

As part of the business of constructing public facilities, Preston was required to obtain bid, performance, and payment bonds. His bonding was principally with Maine Bonding & Casualty Co. (Maine Bonding), both before and after incorporation of the business. In 1968, after M & P was incorporated, Maine Bonding required the Prestons individually to sign an indemnity agreement as a condition to issuing any bonds to the corporation.[3] There was evidence that Maine Bonding required this agreement because M & P had very limited resources—only $20,000 in its capital stock account—and therefore virtually no working capital. The agreement provided, in essence, that Maine Bonding would issue bonds on M & P's contracts, but if M & P defaulted on any obligations covered by the bonds, Maine Bonding would be indemni-

---

1. The claimed deductions arose in 1971. The refund for 1968 stemmed from a proposed carryback of part of the loss incurred in 1971. Although the deficiency was assessed against the joint return of Mr. and Mrs. Preston, we will refer to Preston as the taxpayer.

2. After M & P was incorporated, those jobs which were already in progress were maintained in the name of the sole proprietorship but were completed by the corporation. Net profits from those jobs went to Preston, not to M & P. The net profits from those jobs during the period of M & P's incorporation totalled around $67,000.

3. When the business was still a sole proprietorship, Maine Bonding had required an indemnity agreement only with Mrs. Preston, Preston himself already being individually liable for M & P's obligations as sole proprietor. The purpose of this indemnity agreement was to ensure that Preston would not attempt to transfer assets into his wife's name and so insulate them from creditors of the proprietorship. Otherwise, Preston's assets were deemed sufficient for Maine Bonding to act as surety without further protection.

fied by the Prestons for losses incurred in making good on its bonds.

Evidence was also presented of M & P's cash flow. Preston would advance cash to the corporation as needed and, as contract payments came in, would withdraw cash which was not needed. No notes or other evidence of indebtedness were ever issued to Preston for these advances, nor was any interest ever charged. These cash advances were recorded on trial balance sheets as "Due Wm. A. Preston".[4] (There were other entries on the trial balance sheets marked "notes payable" to various third parties.) The trial balance sheets were work papers drawn up by M & P's accountant in the course of preparing the corporation's income tax returns. The sheets were based on information gathered from Preston himself and from the books and records maintained by Mrs. Preston. The net figure of these advances and withdrawals was then recorded on the corporate income tax return under the heading "loans from stockholders". The net figures recorded on the returns under this heading were $75,412 as of March 31, 1969; $30,953 as of March 31, 1970; and $28,148 as of March 31, 1971.

In late 1969, M & P began to experience financial difficulties.[5] Although business had been booming, no new jobs were on the horizon and unforeseen complications had arisen in the two major construction projects on which M & P was then working, the Waterville Osteopathic Hospital and the Maine Maritime Academy. Maine Bonding had issued bonds for both these projects. By the summer of 1971, M & P had defaulted on many of its obligations to subcontractors and suppliers. Maine Bonding received a number of calls from the architect in charge of the Waterville Hospital project. He complained that the project was not

being completed satisfactorily, that suppliers and subcontractors were unpaid, and that liens had been threatened or filed against the project. George Frame, an officer of Maine Bonding who had dealt with Preston in the past, wrote Preston on June 18, 1971, saying that he had received complaints and urging that the two meet. Preston subsequently met with Frame and others and a "general understanding" was reached that Preston would attempt to finish payment of its obligations and complete the project to the satisfaction of the architect. Preston afterwards personally advanced approximately $94,000 to M & P which enabled it to do so.[6] Mrs. Preston testified that the purpose of the advances was to keep the corporation going in the hope that it would return to the "good years". These advances came out of Preston's personal bank account and out of proceeds from the sale of certain of his investment securities. They were recorded on the corporation's books in accordance with the normal procedure for advances by Preston.

After the completion of the Waterville Hospital, M & P maintained a skeleton crew in the hope that it might obtain new contracts. No work was forthcoming, however, and the corporation was dissolved in late 1971. The net figure listed on the last work sheet as "due Wm. A. Preston" was $105,807.46. This amount was conceded to have been uncollectible at the time of M & P's dissolution. It was deducted by Preston on his 1971 tax return as a business bad debt under § 166 of the Internal Revenue Code.

## II.

■ A principal question for decision is whether the advances made by Preston in

---

4. The net profits from the sole proprietorship's contracts were also included in this entry.

5. On M & P's corporate income tax return for its first full fiscal year (April 1, 1969, to March 31, 1970), it reported gross sales of $1,560,742, yielding a gross profit of $123,163. Although gross sales increased in the ensuing fiscal year (ending March 31, 1971) to $1,978,021, M & P suffered a gross deficit of $59,877 and a total

net operating loss of $144,403. The corporation was dissolved on December 21, 1971, and on its tax return for the short year ending December 31, 1971, reported a net loss of $57,521 on sales of $26,261.

6. There appears to be some discrepancy in the record as to the exact figure, but that dispute is immaterial.

1971 to M & P created a bona fide "debt", as that term is understood under § 166, or whether they should be regarded as contributions to capital, since the two are given different tax treatment. Contributions to capital, like gifts, cannot give rise to a bad debt deduction:

> "*Bona fide debt required.* Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital shall not be considered a debt for purposes of section 166 . . . ."

Treas.Reg. § 1.166–1(c). In characterizing an advance as debt or equity, "objective factors are to be considered and given weight under the particular circumstances of the case, along with evidence of the intent of the parties . . . ." *In re Uneco*, 532 F.2d 1204, 1209 (8th Cir. 1976).

As for the respective tax treatments, if the advances were contributions to capital, they would be added to the basis of Preston's stock. His loss from the transaction would be recognized upon the stock's becoming worthless, and generally would be deductible only as a capital loss. § 165(f) & (g).[7] On the other hand, if the advances are deemed to have created a bona fide indebtedness, they would be deductible as a bad debt loss under § 166.[8] In that event, a further question would arise—whether the debt may be properly characterized as a

---

7. Section 165, entitled "Losses", provides in part:

" .  .  .  .  .

(f) Capital losses.—Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212.

(g) Worthless securities.—

(1) General rule.—If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.

(2) Security defined.—For purposes of this subsection, the term 'security' means—

(A) a share of stock in a corporation;

(B) a right to subscribe for, or to receive, a share of stock in a corporation; or

(C) a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government or political subdivision thereof, with interest coupons or in registered form.  .  .  ."

8. Section 166, entitled "Bad debts", provides in part:

"(a) General rule.—

(1) Wholly worthless debts.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

(2) Partially worthless debts.—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

(b) Amount of deduction.—For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

" .  .  .  .  .

(d) Nonbusiness debts.—

(1) General rule.—In the case of a taxpayer other than a corporation—

(A) subsections (a) and (c) shall not apply to any nonbusiness debt; and

(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.

(2) Nonbusiness debt defined.—For purposes of paragraph (1), the term 'nonbusiness debt' means a debt other than—

(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

(e) Worthless securities.—This section shall not apply to a debt which is evidenced by a security as defined in section 165(g)(2)(C).

(f) Guarantor of certain noncorporate obligations.—A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment.  .  .  ."

business or a nonbusiness bad debt. If business, the loss may be deducted in full against ordinary income; and if nonbusiness, the loss is treated as a short-term capital loss. § 166(a) & (d).

## III.

The jury, in answer to special interrogatories, found (1) that the advances created a bona fide indebtedness on the part of M & P to Preston, and (2) that the indebtedness was a business debt. The district court concluded, however, that no reasonable person could have found that the advances made by Preston to M & P were loans and not contributions to capital, and consequently entered judgment in favor of the Commissioner. In so deciding, it relied principally upon *Raymond v. United States*, 511 F.2d 185 (6th Cir. 1975), a case disallowing bad debt treatment to a series of advances made to a family corporation by its principals. We agree with the district court that the advances here cannot, under any reasonable construction, be regarded as creating an indebtedness for purposes of § 166. Accordingly, the court correctly disregarded the jury's special finding. *See Brown v. Lamb*, 134 U.S.App.D.C. 314, 414 F.2d 1210 (1969), *cert. denied*, 397 U.S. 907, 90 S.Ct. 904, 25 L.Ed.2d 88 (1970).

The only evidence found by the district court that the 1971 advances were loans was (1) the statement attached to Preston's individual income tax return and (2) the listing of the advances as " 'amounts due shareholder' " on the trial balance sheets referred to above. With respect to (2), the court thought it significant that these characterizations were the creation of Preston's accountant, and that the advances were not so recorded contemporaneously on the corporation's original books and records. The court cited the following evidence as contraindicating a bona fide indebtedness:

> "(1) No notes or other written evidences of indebtedness were given by the corporation either at the time the advances were made or subsequent thereto. (2) No security or collateral of any type was given by the corporation to Mr. Preston.

(3) No interest was to be paid on the amounts advanced. (4) No fixed date or dates were set for the repayment of the advances; indeed, there is no record indicating that there was *any* undertaking by the corporation to repay the advances. (5) The corporation was grossly undercapitalized for the amount of business which it was endeavoring to undertake. (6) Very significantly, Mrs. Preston, who made a completely candid and honest witness for the plaintiffs, conceded that at the time the advances were made by her husband, the only hope of repayment was that the corporation might obtain future projects; that the advances were made by Mr. Preston to the corporation with the hope that future earnings of the corporation might produce funds which would not only repay the advances but would insure the continuance of the business and future profit; and, in her words, that her husband was hoping for—was looking to—a return to the halcyon days of 1969 and prior years when he was earning an income of approximately $200,000–$250,000 a year. (7) It is inconceivable that any third person or any outside lending institution would have advanced to this corporation the amounts advanced by Mr. Preston at the times when the advances were made. (8) The timing of the advances, which is significant—the corporation at the time of the advances was in a desperate financial situation; with no funds coming in, a serious cash flow shortage existed."

■ In deciding how to characterize the transaction, the court below properly surveyed a number of different factors, rather than only one or two. *In re Uneco, supra*, 523 F.2d 1204; *see Brake & Electric Sales Corp. v. United States*, 287 F.2d 426 (1st Cir. 1961). However, we think it should not have overlooked the possible effect on this transaction of the pre-existing indemnity agreement. Preston was not in the position of the ordinary stockholder who voluntarily advances money to his insolvent corporation. Under the terms of the 1968 agreement with Maine Bonding, he was ultimate-

ly liable for any amounts which the bonding company had to pay out under the bonds. Thus, whether or not the advances to M & P were technically in discharge of his obligations under the indemnity agreement, Preston had to pay; his only choice was as to the form and timing of the payments. It seems unrealistic, therefore, to view the advances in isolation from the indemnity agreement which compelled them.

■ Even, however, when attention is focused upon the indemnity agreement, we see the entire transaction not as a loan but as a contribution to capital. True, when Preston signed the indemnity agreement M & P was a going enterprise, and we shall assume that the jury could have found that he did not then believe that he would be called upon to indemnify Maine Bonding, since if business remained good, the company itself would be able to meet its obligations. Had Preston loaned money to M & P in 1968, "the genuineness of repayment prospects in the light of economic realities" might have indicated the creation of a *bona fide* debt. *American Processing and Sales Co. v. United States*, 371 F.2d 842, 857, 178 Ct.Cl. 353 (1967).

But Preston did not loan money to M & P in 1968. What he did loan was his personal credit, making it possible for M & P, which was unable to secure bonds on its own credit, to receive the essential benefits of the bonds. Not only was no debtor-creditor relationship created between the company and Preston in 1968, but by the nature of the arrangement, Preston was expected to put up his own money only if M & P should be in default, by which time any right which Preston would acquire against M & P, whether accruing by subrogation or otherwise, would be more theoretical than real. Thus, we do not see the realities of the transaction as at any time based on the creation of a serious debtor-creditor relationship between Preston and his company. We think the true character of the indemnity agreement is similar to the personal guarantee made by a corporate officer and chief shareholder to creditors of the corporation described by Judge Simpson in *Plan-*

*tation Patterns, Inc. v. Commissioner of Internal Revenue*, 462 F.2d 712, 722–23 (5th Cir. 1972), *cert. denied*, 409 U.S. 1076, 93 S.Ct. 683, 34 L.Ed.2d 664 (1973):

"The guarantee enabled Mr. Jemison to put a minimum amount of cash into New Plantation immediately, and to avoid any further cash investment in the corporation unless and until it should fall on hard times. At the same time he exercised total control over its management. Adding together the personal guarantee of Mr. Jemison to the guarantee of Jemison Investment Company, which was wholly owned by him and Mr. Jemison's control of New Plantation, we think that the result is that Mr. Jemison's guarantee simply amounted to a covert way of putting his money 'at the risk of the business.' Stated differently, the guarantee enabled Mr. Jemison to create borrowing power for the corporation which normally would have existed only through the presence of more adequate capitalization of New Plantation."

Here the indemnity enabled Mr. Preston to make it possible for his company to secure bonds which would otherwise have been available only through the presence of more adequate capitalization or collateral. We do not think the indemnity arrangement, nor Mr. Preston's subsequent actions enabling M & P to pay off creditors after M & P had defaulted, can be viewed as establishing a meaningful debtor-creditor relationship between himself and M & P.

Plaintiffs argue that under *Putnam v. Commissioner of Internal Revenue*, 352 U.S. 82, 77 S.Ct. 175, 1 L.Ed.2d 144 (1956), unsatisfied advances made in discharge of a guarantee are, as a matter of law, bad debt losses. It is true that in the course of that opinion the Court stated that administrative and judicial construction of the internal revenue laws "have always treated guarantors' losses as bad debt losses." *Id.* at 86, 77 S.Ct. at 177. But we think the Court's expansive language is limited by its context. The issue in *Putnam* was whether a guarantor's loss was to be treated as a fully deductible loss under the predecessor to § 165(c)(2), or as a nonbusiness bad debt

which received only capital loss treatment under the predecessor to § 166(d). The taxpayer urged the former; the Commissioner the latter. In upholding the Commissioner, the Supreme Court ruled, "a loss attributable to the worthlessness of a debt shall be regarded as a bad debt loss, deductible as such or not at all." *Id.* at 88, 77 S.Ct. at 178. The Court was not called upon in *Putnam* to distinguish, as we are here, between a business (i. e. fully deductible) debt and an advance in the nature of a capital contribution. It relied heavily on the argument that its decision, limiting the taxpayer to capital loss treatment, reflected the economic reality of the transaction:

> "The loss [Putnam] sustained when his stock became worthless, as well as the losses from the worthlessness of the loans he made directly to the corporation, would receive capital loss treatment; the 1939 Code so provides as to nonbusiness losses both from worthless stock investments and from loans to a corporation, whether or not the loans are evidenced by a security. [footnote omitted]. It is clearly a 'fairer reflection' of Putnam's 1948 taxable income to treat the instant loss similarly. There is no real or economic difference between the loss of an investment made in the form of a direct loan to a corporation and one made indirectly in the form of a guaranteed bank loan. The tax consequences should in all reason be the same . . . ."

*Id.* at 92–93, 77 S.Ct. at 180. This reasoning supports the Commissioner's argument here that,

> ". . . *Putnam* is viewed as protecting the statutory scheme for the common tax treatment (capital loss) of losses sustained by shareholders in providing financing for a corporation, whether directly by a loan to the corporation or indirectly by a guaranteed loan . . . ."

Since the Supreme Court handed down its decision in *Putnam,* lower courts have considered whether a guaranty of a corporation's obligations by its stockholder is to be treated as a loan or a contribution to capital. *See Plantation Patterns, Inc. v. Commissioner of Internal Revenue, supra,* 462 F.2d 712; *Murphy Logging Co. v. United States,* 378 F.2d 222 (9th Cir. 1967); *Ackerson v. United States,* 277 F.Supp. 475 (W.D. Ky.1967); *J. Paul Smyers,* 57 T.C. 189 (1971); *Santa Anita Consol.,* 50 T.C. 536 (1968). *See also E. J. Ellisberg,* 9 T.C. 463 (1947). While these courts have divided in characterizing claimed deductions for losses incurred as a result of such guaranties, they have generally approached the question as one of fact[9] rather than of law:

> "[T]hat the advances were made in the form of guaranteed debt does not, in and of itself, negate their treatment as capital contributions. Whether such debt is to be treated as an indirect capital contribution must be resolved by an investiga-

**9.** Congress itself has acknowledged the general factual approach to debt-equity problems. Section 385 of the 1954 Internal Revenue Code, as amended provides as follows:

"(a) Authority to prescribe regulations.— The Secretary or his delegate is authorized to prescribe such regulations as may be necessary or appropriate to determine whether an interest in a corporation is to be treated for purposes of this title as stock or indebtedness.

(b) *Factors.*—The regulations prescribed under this section shall set forth factors which are to be taken into account in determining with respect to a particular factual situation whether a debtor-creditor relationship exists or a corporation-shareholder relationship exists. The factors so set forth in the regulations may include among other factors:

(1) whether there is a written unconditional promise to pay on demand or on a specified date a sum certain in money in return for an adequate consideration in money or money's worth, and to pay a fixed rate of interest,

(2) whether there is subordination to or preference over any indebtedness of the corporation,

(3) the ratio of debt to equity of the corporation,

(4) whether there is convertibility into the stock of the corporation, and

(5) the relationship between holdings of stock in the corporation and holdings of the interest in question."

The Secretary has not as yet promulgated regulations under the authority granted to him in this provision.

tion of the facts in the light of traditional debt-equity principles."

*Santa Anita Consol., supra,* at 550. *E. g., John Kelley Co. v. Commissioner of Internal Revenue,* 326 U.S. 521, 530, 66 S.Ct. 299, 90 L.Ed. 278 (1946).

Here we think the facts indicate unmistakably that Preston's execution of the indemnity, followed by his advancements at a time when his company was in financial trouble, were contributions to capital rather than a loan creating a specific debtor-creditor relationship. Preston, to be sure, doubtless hoped, if business improved, to recover those advances in one way or another. As the owner and chief officer of M & P, he could, without difficulty, reimburse himself if the company's condition permitted; but we do not think the dominant character of the transaction was to create a debt under § 166.

*Affirmed.*