HAROLD E. SLATER, JR. AND SHIRLEE M. SLATER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Slater v. Commissioner
Docket No. 17646-84.
United States Tax Court
T.C. Memo 1989-35; 1989 Tax Ct. Memo LEXIS 35; 56 T.C.M. (CCH) 1135; T.C.M. (RIA) 89035; January 19, 1989. John F. Nolan, for the petitioners. A. Lavar Taylor and Steven L. Staker, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: In a statutory notice of deficiency dated March 8, 1984, respondent determined deficiencies in petitioners' income taxes as follows: Year
Deficiency
1975
$  23,917
1977
29,321
1978
134,550
The issues for our consideration involve the characterization of purported loans or advances to petitioners' controlled corporations. We must decide: (1) Whether and to what extent a valid debt was created; (2) if a valid debt was created, the year it became worthless; (3) whether the *37 debt should be characterized as business or nonbusiness; and (4) if the debt was nonbusiness, whether it was a business or nonbusiness capital loss. We also must consider petitioners' alternative argument that the expenditures related to the indebtedness are deductible under section 162. [1] Finally, we must consider whether certain property sold by petitioners was used in a trade or business for purposes of computing a net operating loss. FINDINGS OF FACT Petitioners Harold E. Slater, Jr., and Shirlee M. Slater, husband and wife, resided in West Covina, California, when they filed their petition in this case. The stipulation of facts and attached exhibits are incorporated by this reference. From 1971 to 1980, petitioners manufactured and wholesaled motor homes through two wholly owned corporations: Commander Motor Homes, Inc. (Commander), and Recreation and Sports, Inc. (Sports). Commander, a "subchapter S" corporation, was organized in 1971 to build motor homes on Chrysler chassis. Sports, a "C" corporation, was organized in 1969 to wholesale the motor homes *38 built by Commander. Petitioner Harold Slater was employed in the motor home and travel trailer industry approximately 20 years before forming Commander. Petitioners also owned an unincorporated business, M & S Leasing, that leased land and equipment to Commander. From 1971 to 1978, petitioners did relatively well in the motor home business. Commander and Sports reported taxable income for their taxable years 1971 through 1979 as follows: Year
Commander
Sports
1971 (2/29/72)
$   50,687 $   73,290 1972 (2/28/73)
541,503 357,488 1973 (2/28/74)
(19,124)
(91,167)
1974 (2/28/75)
(945)
6,223 1975 (2/29/76)
16,541 45,912 1976 (2/28/77)
68,750 290,756 1977 (2/28/78)
89,740 179,175 1978 (2/28/79)
359,678 293,365 1979 (2/29/80)
(368,275)
(332,954)
Commander and Sports were both on fiscal years ending February 28. Petitioners also reported compensation income, and income from M & S Leasing, as follows: Year [2]
Salary
M & S
1971
$ 242,100
not available
1972
165,050
not available
1973
120,000
not available
1974
237,000
not available
1975
129,000
$ 130,096
1976
189,500
not available
1977
176,000
156,000
1978
233,000
180,510
1979
208,000
173,095
1980
44,000
15,608
*39 Petitioners decided how much salary to pay themselves from the two corporations. Due to the gasoline shortage, sales dropped precipitously in 1979 and later years, causing the demise of both Commander and Sports. Commander ceased operations in December 1979. A similar gasoline shortage in 1973 had almost forced closure of the business. In an attempt to prevent the impending closing of the business, in February 1979 Commander obtained a loan from Union Bank, apparently in addition to amounts previously borrowed from that bank. In order to obtain the loan, petitioners had to personally guarantee amounts up to $ 500,000. At the time Union Bank made the loan, Commander was insolvent. As of August 1979, Commander owed Union Bank $ 450,000 principal. In May 1980, petitioners paid this amount, plus interest, from their personal account. Another of *40 Commander's creditors was the Chrysler Corporation, who built the chassis for the motor homes. Apparently, in accord with the terms of an "Agreement Transferring Collateral in Satisfaction of Debt and Mutual Release" between Commander, Sports, petitioners and Chrysler, petitioners' attorneys paid Chrysler $ 291,000 in March and April 1980. At the time Chrysler was paid, operations had ceased and petitioner knew he would not be receiving any more salary or rent from Commander. Petitioners engaged a bankruptcy attorney to deal with other general creditors. Utilizing the services of Credit Manager's Association, an intermediary between debtors and creditors, a negotiated settlement of 30 cents per dollar was reached between Commander and its creditors. After the sale of Commander's assets in 1980 netted approximately $ 68,000, petitioners, through their attorney's trust account, paid approximately $ 148,000, the remainder of the settlement. Petitioners did not include themselves as creditors of Commander. Petitioners knew when they advanced money to pay the general creditors that they would not be paid back. Commander's accounting system was much like that of a proprietorship. *41 Commander never had any retained earnings. In lieu of a retained earnings account, Commander used an account labeled loans payable to shareholders. At the end of the year, any profits would be closed out to the loans payable to shareholders account. The loans payable account would then be adjusted for advances, receipts and draws by petitioners. There was no other equity capital account, except for a $ 5,000 original contribution. Commander's balance sheet, as taken from its income tax returns for taxable years 1971 to 1979, reported the following account balances in its shareholder loan account. A negative amount indicates loans to shareholders, while a positive amount indicates loans from shareholders: 1971
$    50,687 1972
none 1973
78,427 1974
(6,692)
1975
(53,404)
1976
82,549 1977
(47,080)
1978
(340,641)
1979
696,905 Petitioners apparently drew all the earnings from Commander, even though only one distribution was reported on Commander's 1971 return. Petitioners, through their accountants, made a number of adjustments to the shareholder loan account to reach the $ 696,000 figure. At the end of each year, and apparently *42 in 1979, the shareholder loan payable account balance from Sports was transferred to Commander. In addition, petitioners were given credit for payments to Chrysler Corporation, which were apparently recorded as payable to petitioners on the books of Sports. Finally, Commander's $ 450,000 Union Bank loan, paid by petitioners in May 1980, was transferred from a debt to Union Bank into a debt to petitioners, i.e., the shareholder loan payable account. In other words, with respect to the latter two adjustments, petitioners paid corporate expenses out of their personal account and included those amounts in Commander's shareholder loan payable. The shareholder loan payable account was credited in February, even though petitioners did not make the payments until later in the year. Also in 1980, petitioners sold a vacant lot adjacent to the Commander factory. The lot had been acquired several years earlier for the purpose of expanding the motor home business. The proposed expansion, however, never occurred. Petitioners allowed Chrysler to store chassis on the property when manufacturing slowed down. Petitioners realized a gain on the sale of the property of $ 74,513, which they reported *43 on their 1980 return as a long-term capital gain. On their original return for 1980, petitioners claimed a $ 446,290 nonbusiness bad debt loss from the worthlessness of the shareholder loan payable account, derived as follows: Shareholder loan payable account balance
$ 696,905.10 Rent expense
6,930.00 Subchapter S loss -- Commander 1979
(368,275.00)
Corporate expenses paid through attorneys
110,729.46 Bad Debt Deduction on 1980 return
446,289.56 In an amended return, petitioners changed the characterization of the debt from a nonbusiness to a business bad debt. The above items entered into the computation of a net operating loss for 1980, the carryback of which is the source of respondent's determined deficiencies in this action. OPINION Section 166(a) allows a deduction for debts that become worthless within the taxable year. A deductible bad debt must arise from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital is not a debt. Sec. 1.166-1(c), Income Tax Regs. In the case of a noncorporate taxpayer, any nonbusiness bad debt is treated *44 as a short-term capital loss. Sec. 166(d). Therefore, as a preliminary matter petitioners must prove the existence and amount of a bona fide debt, and then must prove its business character. Petitioners argue that the record establishes the existence and amount of the debt. Further, they argue, on the authority of United States v. Generes,405 U.S. 93 (1972), that the advances were made to protect their salary income, and therefore, were business bad debts. Respondent argues that the debtor-creditor relationship and the amount, timing and character of the debt have not been established, and alternatively, that the advances were contributions to capital. We agree with respondent. Courts have used a number of factors to determine whether a debtor-creditor relationship has been established, or whether advances made to a corporation are contributions to capital. These include whether there is (1) a fixed date of repayment, (2) reasonable expectation of repayment, (3) notes or other evidence of indebtedness, and (4) interest. Zimmerman v. United States,318 F.2d 611 (9th Cir. 1963). Additionally, courts have considered (5) status of the advances *45 in relation to regular corporate creditors, (6) identity of interest between creditor and stockholder, (7) thinness of capital structure, and (8) ability of the corporation to obtain outside loans. Estate of Mixon v. United States,464 F.2d 394 (5th Cir. 1972); A. R. Lantz Co. v. United States,424 F.2d 1330 (9th Cir. 1970); Recklitis v. Commissioner,91 T.C. 874, 901 (1988); Dixie Dairies Corp. v. Commissioner,74 T.C. 476 (1980). The ultimate question is "Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" Litton Business Systems, Inc. v. Commissioner,61 T.C. 367, 377 (1973). Essentially, petitioners point to the shareholder loan account for the proposition that advances and payments on behalf of their corporations constituted loans, which became bad debts. However, not all advances are loans, and "bookkeeping entries can be given little weight unless supported by some other objective evidence * * *." Dixie Dairies Corp. v. Commissioner, supra at 495. *46 Utilizing the factors noted above, we overwhelmingly come to the conclusion that no debtor-creditor relationship was created. There was no fixed date of repayment, no notes or other evidence of indebtedness, and no provision for interest. See Root v. Commissioner,220 F.2d 240 (9th Cir. 1955); Curry v. United States,396 F.2d 630 (5th Cir. 1968). Petitioners, on brief, admit that no notes were made "based upon the fact that it was known that Commander * * * would be unable to repay said loans." Petitioners did not prepare notes at the time of payment and, more importantly, did not do so when Commander accrued these so-called debts. There is further evidence that petitioners did not expect to be repaid the amounts in question. Commander accrued as shareholder loans amounts payable to the Credit Managers Association. Clearly, at that point in time petitioners could not expect that these amounts would be repaid. Similarly, when Commander and Sports settled with Chrysler, petitioners, considering the then existing circumstances, could not reasonably expect repayment of sums advanced. At the time of the guarantee to Union Bank, Commander was insolvent. *47 At best, petitioners could only expect repayment in the unlikely event the business turned around. See Roth Steel Tube Co. v. Commissioner,800 F.2d 625 (6th Cir. 1986); Davis v. Commissioner,69 T.C. 814 (1978); Kalech v. Commissioner,23 T.C. 672 (1955). There are other factors that also mitigate against petitioners. Petitioners did not put in claims as general creditors of Commander during the Credit Managers Association proceedings. In effect, they subordinated their claims and, we think, intended to put any advances at risk in the business. See Schnitzer v. Commissioner,13 T.C. 43 (1949), affd. 183 F.2d 70 (9th Cir. 1950). Moreover, there is complete identity of shareholder and creditor. In addition, Commander could not obtain loans without petitioners' personal guarantee. Commander was also thinly capitalized. The only capital shown was the $ 5,000 original capital contribution. Commander had no retained earnings. Any earnings went into the shareholder loan account, which petitioners now claim is a bad debt. The shareholder loan account was, in essence, an equity account, not a liability *48 or debt. A corporation is a distinct legal entity from its shareholders. Shareholders are not normally liable for debts of the corporation. Therefore, we find it significant, in relation to the inadequate capitalization, that petitioners were advised to guarantee and pay, personally, general creditors of the corporation. In addition, the absence of any meaningful positive figure in the shareholder loan account prior to 1979, when coupled with large amounts of taxable income earned prior to that year, indicate to us that petitioners drew most of the earnings out of the business, leaving it without adequate capitalization. When viewed in this light, the guarantees were made in lieu of placing adequate risk capital in the corporation. Petitioners argue that payment of the Union Bank guarantee created a debt running from Commander to petitioners, citing Gillespie v. Commissioner,54 T.C. 1025 (1970), affd. (9th Cir. 1972, 72-2 USTC par. 9742, 30 AFTR2d 72-5574). Thus, the Union Bank guarantee resulted in a bad debt loss. We disagree. Guarantee liability is not, as a matter of law, characterized as debt. In re Lane,742 F.2d 1311 (11th Cir. 1984); *49 Casco Bank & Trust Co. v. United States,544 F.2d 528 (1st Cir. 1976), cert. denied 430 U.S. 907 (1977). Guarantee liability may still be recharacterized as equity. In re Lane, supra;Plantation Patterns, Inc. v. Commissioner,462 F.2d 712 (5th Cir. 1972), affg. T.C. Memo. 1970-182; Smyers v. Commissioner,57 T.C. 189 (1971); Santa Anita Consolidated, Inc. v. Commissioner,50 T.C. 536 (1968). Use of traditional debt-equity principles leaves the conclusion that all amounts, including those guaranteed, were not debt but capital contributions. Finding that the amounts were capital contributions makes it unnecessary to address respondent's other arguments, and the additional characterization issues raised by petitioners. In addition, our finding that the advances were capital contributions renders moot petitioners' argument that the advances were deductible under section 162 or as an ordinary loss under section 165. In essence, petitioners have unsuccessfully attempted to turn a long-term capital loss, which we believe they sustained, into a short term or ordinary loss. Section *50 165(g) allows a deduction for securities that become worthless during the taxable year. The amount of the loss is the taxpayer's adjusted basis in the stock. Sec. 165(b). Respondent contended, and we agreed, that the advances were, in essence, capital contributions. Such contributions would be added to the basis of petitioners' stock in Commander. Petitioners have established that they made advances in amounts at least equal to $ 807,634.56 -- the shareholder loan payable account balance plus corporate expenses paid through their attorneys. Deducting Commander's 1979 net operating loss leaves a basis in Commander's stock of at least $ 439,359.56. See sec . 1376(b). We find that petitioners' stock in Commander became worthless in 1980. While Commander ceased operations in 1979, it was not until 1980 that negotiations with creditors were completed and assets disposed of. It was not certain that manufacturing would not resume if economic conditions improved. A similar situation occurred in 1973 that did not result in dissolution of the business. Therefore, we find that petitioners' stock in Commander became worthless in 1980, entitling them to a long-term capital loss deduction *51 under section 165(g) of $ 439,359.56. Section 172(d)(4) allows deductions not attributable to a taxpayer's trade or business to be used in the net operating loss computation only to the extent there is gross income not derived from the taxpayer's trade or business. The amount deductible on account of nonbusiness capital losses cannot exceed the amount of nonbusiness capital gains. Sec. 1.172-3(a)(2)(ii), Income Tax Regs.; Erfurth v. Commissioner,77 T.C. 570 (1981). Because the trade or business of the corporation is different from that of its sole stockholder, losses from the worthlessness of such shareholder's stock are nonbusiness capital losses. Dalton v. Bowers,287 U.S. 404 (1932); Burnet v. Clark,287 U.S. 410 (1932). Moreover, where, as here, the corporation was seriously undercapitalized, any advances sustained or protected petitioners' stock/investment interest rather than any interest as employees. See United States v. Generes,405 U.S. 93 (1972). Therefore,the loss is a nonbusiness capital loss. A final issue, raised by respondent in his amended answer, is that the vacant lot sold by petitioners *52 in 1980 was used in the trade or business for net operating loss computation purposes. Gain or loss from the sale of real property used in the trade or business is treated as attributable to the trade or business. Sec. 172(d)(4)(A). The lot was purchased with the intention of expanding the motor home business. In addition, petitioners allowed Chrysler to use the lot for storing chassis during slow periods. Therefore, we find that the vacant lot adjacent to the motor home factory was used in a trade or business. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code, as amended and in effect during the years at issue.↩
2. For years 1971 through 1974, and 1976, petitioners' returns are not in the record, and the figures are approximated using the figures from the returns of Commander and Sports. They would not exactly coincide because Commander and Sports were both on fiscal years ending Feb. 28, while petitioners used the calendar year.↩