T.C. Memo. 1997-377


UNITED STATES TAX COURT


GLENN AND MARION PETERSON, Petitioners v. COMMISSIONER OF
INTERNAL REVENUE, Respondent


Docket No. 4736-95.              Filed August 19, 1997.


Glenn and Marion Peterson, pro sese.

Mark Hulse, for respondent.


MEMORANDUM OPINION

TANNENWALD, Judge:  Respondent determined the following
deficiencies and additions to tax and a penalty in petitioners'
Federal income taxes:

| Year | Deficiencies | Additions and Penalty | | |
| | | Sec. 6651 | Sec. 6653 | Sec. 6662 |
| 1988 | $ 3,868 | --- | $193 | --- |
| 1989 | $12,366 | $1,378 | --- | $2,473 |

After concessions by the parties, the issue for decision is whether petitioners may take a business bad debt deduction for payment made on a guarantee of corporate indebtedness.

Background

This case was submitted fully stipulated under Rule 122.[1] The stipulation of facts and exhibits are incorporated herein by this reference and found accordingly.

Petitioners, husband and wife, resided in Syosset, New York, at the time of the filing of the petition. They filed their 1988 Federal income tax return untimely on April 17, 1992, and their 1989 Federal income tax return untimely on April 15, 1993. On January 12, 1995, respondent mailed to petitioners a statutory notice of deficiency for the 1988 and 1989 taxable years.

Dutchess Processing Company, Inc. (Dutchess), was incorporated in August 1974, to engage in the processing, preserving, and canning of apples and apple byproducts. Its shareholders and officers were petitioner Glenn Peterson, his father John Peterson, and Woodrow Pereira.[2]

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The stipulation of facts refers only to the status of these individuals as officers, but petitioners' opening brief describes them as the "three shareholders" who were "all active

(continued...)

From October 1974 until May 1975, one of Dutchess' principal customers, to which it sold processed apples, was Entenmann's Bakery, located in Bay Shore, New York. Dutchess did not grow its own apples. It purchased apples from United Apple Co., Agway, Inc. (Agway), located in Syracuse, New York, and local independent growers. Agway was a primary supplier to Dutchess.

Dutchess was undercapitalized and could purchase apples from Agway only on credit. Agway required Glenn Peterson and the other officers of Dutchess to sign a continuing guarantee under which each officer was jointly and severally liable for the debts of Dutchess to Agway, in an amount not to exceed $300,000. Petitioner signed the "Continuing Guarantee" on October 22, 1974. Dutchess also obtained financing from First National City Bank of New York, in the amount of $25,000, and from Citibank Eastern of Albany, New York, in the amount of $200,000, based on personal guarantees from John Peterson.

Dutchess drew down on the line of credit extended by Agway, to the extent of $75,810 as of January 1975. In February 1975, Dutchess made a repayment of $25,000 to Agway. In April 1975, by which time Dutchess was indebted to Agway for approximately $140,000, Dutchess provided Agway with a check for $15,000, and

---

[2](...continued)
shareholder/officer/employees" of Dutchess. The brief also states that in September and October 1975, petitioner was a one-third shareholder.

the parties agreed to a repayment schedule. However, the check was returned as a result of a lien filed on Dutchess' bank accounts and accounts receivable by Citibank Eastern of Albany. By June 1975, Dutchess was indebted to Agway in the amount of $169,661.34. On June 25, 1975, attorneys for Agway requested each officer of Dutchess to pay the amount due under the line of credit, which totaled $175,244.97 with interest.

On June 18, 1975, Dutchess filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of New York. In early July 1975, Agway filed a proof of claim in that proceeding in the amount of $175,244.97. On July 7, 1975, Agway filed a summons and complaint in the Supreme Court of New York, Onondaga County, against the Dutchess officers, asking for payment under the guarantee. On September 3, 1975, judgment was entered against the officers of Dutchess in favor of Agway in the amount of $205,522.72, which represented the original amount of $169,661.34 due under the line of credit, plus interest and costs.

On August 15, 1975, John Peterson, filed for Chapter 11 bankruptcy protection in the U.S. District Court for the Southern District of New York. John Peterson died in 1986. Despite efforts by petitioners and respondent, Woodrow Pereira's whereabouts were and are unknown. Agway possessed and sold petitioners' residence to satisfy its September 3, 1975, judgment

against the officers of Dutchess, and on January 6, 1988, judgment was entered which required petitioners to remove from their residence located at 795 Rensens Lane, Muttontown, New York. Petitioners vacated their premises pursuant to a February 8, 1988, notice to vacate.

Petitioners claimed a business bad debt loss of $250,000 on their 1988 Federal tax return as a result of the loss of their residence in 1988. Petitioners carried over $232,361 of the ordinary loss claimed but not used on their 1988 return to their 1989 return.

## Discussion

The sole issue for decision is the proper treatment of the loss resulting from the use of petitioners' residence to satisfy the guarantee obligation of petitioner Glenn Peterson to Agway in the amount of $205,522.72.[3] Petitioners claim that they are entitled to a business bad debt deduction under section 166(a). Respondent asserts that the amounts paid on the guarantee represent a contribution to the capital of Dutchess and should be treated as a capital loss under section 165(g) and that, if the

---

[3] While petitioners claimed a bad debt deduction of $250,000.00 on their 1988 return, there is no evidence to support any amount in excess of $205,522.72, the amount of the loss which respondent has conceded petitioners are entitled to deduct as a capital loss stemming from the worthlessness of Glenn Peterson's shareholder interest in Dutchess. Respondent does not contest the worthlessness of that interest.

payment to Agway is held to represent a bad debt, it is a nonbusiness bad debt deductible only as a short-term capital loss pursuant to section 166(d).  The burden of proof is on petitioners.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 114 (1933).  That burden is not lessened in a fully stipulated case. Borchers v. Commissioner, 95 T.C. 82, 91 (1990), affd. 943 F.2d 22 (8th Cir. 1991).

Petitioners rely heavily on Putnam v. Commissioner, 352 U.S. 82 (1956), citing it for the proposition that payments by an individual on a guarantee of corporate debt which are not then repaid to the individual because the obligation to repay is worthless give rise, as a matter of law, to bad debt deductions, pointing to the following:

> The familiar rule is that, instanter upon the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but, by subrogation, the result of the shift of the original debt from the creditor to the guarantor who steps into the creditor's shoes.  Thus, the loss sustained by the guarantor unable to recover from the debtor is by its very nature a loss from the worthlessness of a debt.  This has been consistently recognized in the administrative and the judicial construction of the Internal Revenue laws which, until the decisions of the Courts of Appeals in conflict with the decision below, have always treated guarantors' losses as bad debt losses.  * * *  [Id. at 85-86; fn. refs. omitted.]

This exact argument was raised and rejected in Casco Bank & Trust Co. v. United States, 544 F.2d 528, 533-534 (1st Cir. 1976). First, as the Court of Appeals for the First Circuit pointed out,

the Supreme Court in <u>Putnam</u> was not called upon to decide whether the payment on a guarantee of corporate debt created a bona fide debt, but rather, where the guarantee in fact represented bona fide debt, whether the payment on that guarantee by the shareholder gave rise to a nonbusiness bad debt deductible only as a short-term capital loss, or a business bad debt deductible against ordinary income.  <u>Casco Bank & Trust Co. v. United States</u>, <u>supra</u> at 533-534.

Second, as the Court of Appeals for the First Circuit also succinctly pointed out:

> Since the Supreme Court handed down its decision in <u>Putnam</u>, lower courts have considered whether a guaranty of a corporation's obligations by its stockholder is to be treated as a loan or a contribution to capital.  * * *  [<u>Id.</u> at 534.]

The Court of Appeals went on to emphasize that the inquiry as to how deductions for losses incurred as a result of such guarantees should be characterized involves a question of fact, not law, and that such inquiry is to be resolved in the context of traditional debt-equity principles.  <u>Id.</u>; see also <u>In re Lane</u>, 742 F.2d 1311, 1314-1315 (11th Cir. 1984); sec. 1.166-9(c), Income Tax Regs.[4]

---

[4]  The agreement in this case was made on Oct. 22, 1974. While the regulation in general applies only to agreements entered into after Dec. 31, 1975, and thus would not apply here, the rule in paragraph (c) applies to payments, whenever made, on agreements entered into before Jan. 1, 1976, and therefore does apply in this case.  Sec. 1.166-9(f), Income Tax Regs.

Recognizing that no single factor is determinative, the courts have applied a variety of factors in deciding whether a guarantee was a loan or a capital contribution. Among these factors are the name given to the certificate evidencing the indebtedness, whether repayment depended on the success of the business, whether the right to be repaid by the corporation for payments on the guarantee was subordinated to other corporate indebtedness, what the intent of the parties was in creating the guarantee, whether the initial capital of the corporation was adequate, whether outside sources would have extended the corporation a line of credit without the guarantee, whether the corporation repaid the guaranteed loans, and whether the corporation gave the guarantor or the lender any security. In Re Lane, supra; Plantation Patterns, Inc. v. Commissioner, 462 F.2d 712 (5th Cir. 1972), affg. T.C. Memo. 1970-182; Intergraph Corp. & Subs. v. Commissioner, 106 T.C. 312 (1996). The ultimate question is "'was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?'" Calumet Industries, Inc. v. Commissioner, 95 T.C. 257, 286 (1990) (quoting Litton Bus. Sys., Inc. v. Commissioner, 62 T.C. 367, 377 (1973)).

We see no purpose to be served in analyzing each of the foregoing factors as applied to the situation herein. It is

obvious from our findings of fact that the record herein is totally lacking in evidence sufficient to support petitioners' contention that the guarantee and the payment thereon were anything but capital in nature.  The parties have stipulated that Dutchess was undercapitalized, and the record is devoid of any evidence as to the amount that any of the shareholders invested in Dutchess in addition to the guarantee of the Dutchess' indebtedness.  Glenn Peterson guaranteed indebtedness used to purchase apples sold by Dutchess to its principal customers.  Thus the indebtedness was an essential element in financing Dutchess' operations.

We think the approach of the Court of Appeals for the Fifth Circuit in dealing with a comparable situation in Plantation Patterns, Inc. v. Commissioner, 462 F.2d at 722-723, is particularly applicable herein:

> The guarantee enabled Mr. Jemison to put a minimum amount of cash into New Plantation immediately, and to avoid any further cash investment in the corporation unless and until it should fall on hard times. * * * we think that the result is that Mr. Jemison's guarantee simply amounted to a covert way of putting his money "at the risk of the business".  Stated differently, the guarantee enabled Mr. Jemison to create borrowing power for the corporation which normally would have existed only through the presence of more adequate capitalization of New Plantation.

Indeed this approach coincides with the analysis which this Court applied in disposing of three cases involving facts very similar to those involved here, namely, Titmas v. Commissioner, T.C.

Memo. 1995-267, <u>Slater v. Commissioner</u>, T.C. Memo. 1989-35, and <u>Atkinson v. Commissioner</u>, T.C. Memo. 1984-378. In those cases, the taxpayers were shareholders of closely held corporations. They had signed guarantees on behalf of their corporations, upon which they had to make payment when their businesses failed. In each case, we found that the payments were the equivalent of contributions to capital.

In sum, the facts surrounding Glenn Peterson's guarantee of Dutchess' debt do not show that he intended to create a bona fide debtor-creditor relationship between himself and Dutchess, and do not reflect a reasonable expectation of repayment on his part, but rather show that the payment on the guarantee was a contribution to capital. <u>Calumet Industries, Inc. v. Commissioner</u>, <u>supra</u> at 286. Thus, we sustain the disallowance by respondent of petitioners' bad debt deduction in the amount of $250,000. Petitioners are entitled, as respondent concedes, to a capital loss in the amount of $205,522.72, subject to the limitations of section 1211.

Our conclusion moots the question whether, had we found that the guarantee and its payment gave rise to a bona fide indebtedness and did not constitute a contribution to capital, the bad debt would have been a business rather than a nonbusiness bad debt. We append the following comments on that issue only because petitioners have devoted so much attention to it.

At the outset, we note that in order to constitute a business bad debt, the <u>dominant motive</u> for the indebtedness must relate to the taxpayer's trade or business. <u>United States v. Generes</u>, 405 U.S. 93 (1972). Here petitioners stumble on the definition of "trade or business". They stress several times on brief that the dominant motive of the guarantee was "to preserve his [petitioner Glenn Peterson's] employment and generate future corporate profits." But employment and corporate profits are two distinct concepts. Petitioners misunderstand that Glenn Peterson wore two hats with respect to Dutchess--one as a shareholder-investor, and one as an employee-officer. He had, however, for purposes of section 166, only one trade or business--that of being an employee or officer. Investing in a single enterprise is not a trade or business. <u>Whipple v. Commissioner</u>, 373 U.S. 193 (1963). In this connection, we note that petitioners do not contend that Glenn Peterson was in the trade or business of financing corporations. See <u>Raymond v. United States</u>, 511 F.2d 185, 189 (6th Cir. 1975). In order to qualify for ordinary loss treatment, petitioners would have to show that Glenn Peterson originally made the guarantee to protect his "business" of being an employee. <u>Eisenberg v. Commissioner</u>, 78 T.C. 336, 349 (1982); <u>Shinefeld v. Commissioner</u>, 65 T.C. 1092, 1099 (1976).

Petitioners have conceded on brief that Glenn Peterson and the other shareholders drew "nominal salaries (if any)". We

cannot believe that Glenn Peterson would have signed a guarantee for $300,000 to protect a nominal salary. Garner v. Commissioner, 987 F.2d 267, 272-273 (5th Cir. 1993), affg. T.C. Memo. 1991-569. In this connection, we think it significant that petitioners reported substantial amounts of "wages, salaries, tips, etc." as ordinary income on their 1988 and 1989 returns. This fact, coupled with the conceded nominal salary drawn from Dutchess, points in the direction that Glenn Peterson's main purpose was not to draw salary as an employee of Dutchess, but to realize capital appreciation as a shareholder by way of the hoped-for profitable operation of Dutchess. Indeed, petitioners recognize the multiple nature of Glenn Peterson's role when they repeatedly refer on brief to his status as an "employee/officer/shareholder".

In any event, under the foregoing circumstances, the record is insufficient to satisfy petitioners' burden of proof that protection of Glenn Peterson's employment status was the dominant motive for financing the guarantee. Eisenberg v. Commissioner, supra at 349; Shinefeld v. Commissioner, supra at 1099. We conclude that Glenn Peterson signed the guarantee in his capacity as a shareholder, and therefore, if the payment represented debt instead of a contribution to capital, petitioners would have been entitled to a nonbusiness bad debt deduction, which would have given rise to a short-term capital loss, subject to the

limitations of section 1211.  Sec. 166(d); <u>United States v. Generes</u>, <u>supra</u>; <u>Shinefeld v. Commissioner</u>, <u>supra</u>.

Finally, we take note of the rhetorical question which petitioners pose in their reply brief:

> when Petitioners lost their residence to Agway as a result of the guarantee, who was the real victim? Agway or Petitioners?

We are not unsympathetic to the plight of petitioners, who lost their home in the wake of the failure of Dutchess.  Nevertheless, petitioners may only take those deductions authorized by the Internal Revenue Code.  See <u>Atkinson v. Commissioner</u>, T.C. Memo. 1984-378.

## Additions to Tax and Penalties

Petitioners failed on brief to raise the issue of the additions to tax and the penalty.  By not addressing these issues, petitioners have effectively conceded them.  <u>Sundstrand Corp. v. Commissioner</u>, 96 T.C. 226, 344 (1991).

<u>Decision will be entered under Rule 155</u>.
